Filed 6/5/23  P. v. Daniels CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ISAIAH DANIELS,<br><br>    Defendant and Appellant. | B311093<br>(Los Angeles County<br> Super. Ct. No. GA101244) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Charlaine F. Olmedo, Judge.  Affirmed and remanded with directions.

Elizabeth K. Horowitz, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and Rama R. Maline, Deputy Attorney General, for Plaintiff and Respondent.

This is the third and final appeal from the underlying trial in which appellant Isaiah Daniels and his codefendants, Derion Devon Lee, Charod Robinson, and Pernell Barnes, members of the Duarte Duroc Crips gang (DDC), were convicted of various charges arising from two shootings that occurred as part of a war between DDC and a rival gang, the Pasadena Denver Lane Bloods (PDL).[1] The first shooting (the Douglas shooting) occurred on December 22, 2016, at the Kings Villages apartment complex in Pasadena, a known PDL hangout, and resulted in the killing of Brandon Douglas, a PDL associate. The second shooting (the Vigil shooting) occurred on January 6, 2017, during a candlelight vigil held for Douglas at Kings Villages. Ormoni Duncan and Antoine Sutphen were killed, and Janell Lipkin and Shamark Wright were wounded. Just hours before the Vigil shooting, someone had opened fire on a residence in DDC's territory in Duarte (the Duarte shooting). Lee was the only person charged in connection with both the Douglas and Vigil shootings. Daniels and the other codefendants were charged only with crimes arising out of the Vigil shooting.

As to the Vigil shooting, the jury convicted Daniels of one count of conspiracy to commit murder (Pen. Code, § 182, subd. (a)(1); count 1);[2] two counts of first degree murder (§ 187, subd. (a); counts 2-3) for the killings of Sutphen and Duncan; two counts of attempted willful, deliberate, and premeditated murder (§§ 664/187, subd. (a); counts 4, 9) for the wounding of Lipkin and Wright; and shooting at an inhabited dwelling (§ 246; count 5).

---

[1] Daniels and his codefendants were also tried along with Andrew Vasquez, another DDC member. The jury acquitted Vasquez of all charges. When we refer to Daniels and his "codefendants," we refer only to Lee, Barnes, and Robinson.

[2] Unspecified references to statutes are to the Penal Code.

2

As to the Douglas shooting, the jury convicted Lee of an additional count of first degree murder (§ 187, subd. (a); count 6) for the killing of Douglas. Further, on all counts as to Daniels and his codefendants, the jury found true special circumstance allegations (§ 190.2, subds. (a)(3) [multiple murder], (a)(21) [drive-by murder], (a)(22) [gang murder]) on counts 2, 3, and 6, as well as gang allegations (§ 186.22, subd. (b)(1)(C)) and gang-related firearm allegations (§ 12022.53, subds. (b)-(d)/(e)(1)).[3]

Daniels was sentenced separately from his codefendants. At the sentencing hearing, Daniels was sentenced to three consecutive terms of life imprisonment without the possibility of parole (LWOP) plus 25 years to life on counts 2 and 3, and life imprisonment plus 25 years to life on counts 4 and 9. On count 5, Daniels was sentenced to a consecutive middle-term of five years imprisonment. On count 1, the court imposed and stayed (§ 654) various terms of imprisonment based on the underlying offense and firearm allegations that were found to be true. The court imposed victim restitution, and imposed and stayed various fines, fees, and assessments subject to an ability to pay hearing.

Lee, Barnes, and Robinson each filed separate notices of appeal from the judgment of conviction. After consolidating their three appeals, we issued a partially published opinion in *People v. Lee* (2022) 81 Cal.App.5th 232 (*Lee*), addressing many of the evidentiary and sentencing issues raised in this appeal. As we discuss below, in *Lee* we rejected the codefendants' contentions regarding the admission of various pieces of evidence, as well as the court's use of the kill zone instruction as a theory to prove attempted murder. We

---

[3]     The verdict forms on count 5 (shooting at an inhabited dwelling) listed one firearm enhancement under subdivision (d)/(e)(1) of section 12022.53, which the jury found true.

also found several sentencing errors that are present in Daniels' sentence. On October 19, 2022, the Supreme Court granted petitions for review filed by the Attorney General, Barnes, and Robinson. (See *People v. Lee*, S275449.)[4]

In his opening brief, Daniels joins two arguments raised by his codefendants in *Lee* that: (1) the trial court erred by excluding evidence of third-party culpability with respect to both shootings; and (2) social media messages of Daniels, Barnes, and Robinson were inadmissible based on a lack of foundation. Daniels also raises issues related to claims made in *Lee* regarding (3) the sufficiency of evidence supporting the kill zone instruction on both counts of attempted murder; (4) the admission of improper propensity evidence; and (5) reliance on this propensity evidence by the prosecutor during closing argument.

We conclude that the trial court erred by instructing the jury on the kill zone theory of attempted murder, but find the error harmless. We reject the remaining contentions.

While Daniels' appeal was pending, Assembly Bill No. 333 (Stats. 2021, ch. 669, §§ 1-5) (A.B. 333) became effective. A.B. 333 amended the gang enhancement statute (§ 186.22) to impose additional elements beyond those that were required at the time of trial. A.B. 333 also enacted section 1109, which provides for the bifurcation of trial, upon the defendant's request, of the gang enhancement allegations charged under section 186.22, subdivision (b). In his opening and supplemental

---

[4] The order states that "[f]urther action in this matter is deferred pending consideration and disposition of related issues in *People v. Rojas* (2022) S275835, and *People v. Burgos* (2022) __ Cal.5th __ (see Cal. Rules of Court, rule 8.152(d)(2)), or pending further order of the court." (*People v. Lee* (2022), S275449.) The order also states that "Lee's petition for review is denied." (*Ibid.*)

briefs, Daniels contends that both aspects of A.B. 333 apply here, requiring reversal of his convictions for the failure to bifurcate trial (§ 1109), and reversal of the true findings under the gang enhancement statute (§ 186.22, subd. (b)), the related firearm enhancement statute (§ 12022.53, subds. (b)-(d)/(e)(1)), and the gang-murder special circumstance statute (§ 190.2, subd. (a)(22)). Daniels further contends that the sentencing minute order improperly reflects imposition of multiple LWOP sentences on counts 2 and 3 for first degree murder, and that the sentencing court failed to strike one multiple-murder special circumstance true finding and improperly calculated custody credits.

We agree with all but one of these sentencing issues; we reject the argument that section 1109 retroactively applies to this case, requiring reversal of Daniels' convictions. We vacate the true findings and strike the sentences imposed under sections 186.22, subdivision (b), 190.2, subdivision (a)(22), and 12022.53, subdivisions (b)-(d)/(e)(1), and remand the matter to afford the People the opportunity to retry these allegations in conformance with the current law. We direct the trial court to recalculate days of actual custody credit, and to correct the sentencing minute orders. In all other respects, we affirm the judgment of conviction.

A.    *Prosecution Evidence*

    I.    *Overview*

According to Los Angeles Sheriff's Detective Matthew Thomas, identified as an expert on DDC at trial, Daniels and his codefendants were members of DDC, whose primary territory is in the City of Duarte.  Detective Thomas had personal knowledge of and was familiar with Daniels through prior contacts in the field.  Daniels was known as "Fat Daddy" or "Fat Boy."  Among other names, Lee was known by the moniker "TS."  Barnes was known as "Killa P," and Robinson as "Pac Man."  Between 2016 and 2017, DDC was at war with PDL, whose primary territory is located west of Duarte in the City of Pasadena.

PDL gang members were known to congregate around two apartment complexes in Pasadena, one of which was the Kings Villages, the site of both the Douglas and Vigil shootings.  Detective Thomas considered the shootings in this case to be acts of retaliation by DDC against PDL.

As part of the investigation of the two shootings, officers extracted cellular phone data and obtained geographic locations (pursuant to search warrants) from cellular phones belonging to Daniels and his codefendants;[6] records from Facebook and Instagram

---

[5]    The factual background is taken near verbatim from the unpublished portion of *Lee*, *supra*, 81 Cal.App.5th 232. We have altered the factual background to reflect the litigation designations of Daniels and his codefendants.

[6]    Officers from the Pasadena Police Department were able to extract data from only 4 of the 23 different phones processed in this case.  The geographic locations obtained from historical cell site analyses were provided

for the social media accounts of Daniels, Robinson, and Barnes; and records pertaining to Lee's Google subscriber account. We discuss this evidence as relevant in the chronology of events regarding the two shootings.

II.  *The Douglas Shooting (December 22, 2016)*

Around 9:47 p.m. on December 22, 2016, Pasadena Police Department Officers Lerry Esparza and Aaron Villicana responded to a report of a shooting at Kings Villages in the 1200 block of Fair Oaks Avenue. The officers found Brandon Douglas lying on the sidewalk in a pool of blood. He was wearing a red hat and red shoes, the signature color of Bloods gangs like PDL.[7] Douglas's friend, Leonard Howard, testified that Douglas associated with Bloods gang members, including Howard himself. Douglas died from multiple gunshot wounds.

Forensic specialist Katie Sullivan collected five .40 caliber cartridge cases from the scene. After analyzing the casings, senior criminalist Amanda Davis concluded they had been fired from the same firearm. Davis also analyzed six projectiles (five fired bullets and one bullet fragment) collected from Douglas's body, and concluded that two firearms had been used during the shooting. She identified the first firearm as a .38 special or .357 magnum revolver, and the second as a .40 caliber Smith & Wesson or .10 millimeter automatic handgun.

---

through exhibits and testimony from FBI Special Agent Edwin Nam. We have independently reviewed the trial exhibits of the cell site analysis and cell phone data, and summarize the facts as relevant to those exhibits.

[7]  Detective Thomas testified that an individual wearing a red hat and red shoes would be perceived as a Bloods gang member.

Lee's Google account showed that on December 6, 2016 (16 days before the Douglas shooting), he searched the internet for "man shot in Duarte" (Duarte being DDC territory). Three days later, on December 9, 2016, Lee twice searched for directions to the "King Manor Apartments" in Pasadena. "Kings Manor" was another name by which Kings Villages, the site of the Douglas shooting on December 22, 2016, was known. Lee then visited the Facebook page for the apartment complex.

The week following these searches, on December 13 and 15, 2016, Barnes received two Facebook messages indicating that a named PDL gang member (not Douglas) was "homework," and that DDC needed a "k." According to Detective Thomas, a "k" refers to a kill.

A historical cell site analysis of Lee's cell phone activity on December 22, 2016 (the date of the Douglas shooting), showed the following. Before the shooting, between 7:15 and 8:03 p.m., Lee's phone used a cellular tower in Duarte (the Meridian Street tower) covering a southwest sector of the city. By 8:48 p.m., still before the shooting, Lee's phone had moved from Duarte to Pasadena, using a cellular tower just south and east of 1277 Fair Oaks Avenue in Pasadena. This position placed the phone approximately 1,000 meters away from the scene of the Douglas shooting at Kings Villages. At 9:52 p.m., minutes after the shooting was reported to the police around 9:47 p.m., Lee's phone was still in Pasadena, using another tower covering an area south and east of Kings Villages. Later, at 10:17 p.m., his phone used the Meridian Street tower covering a northwest portion of Duarte.

According to Lee's Google account, at 11:28 p.m., less than two hours after the shooting, he visited the Pasadena Star News website. At the time, the police had yet to inform the public about the Douglas shooting.

8

III.    *The Duarte Shooting (January 6, 2017, 9:00 p.m.)*

Around 9:00 p.m. on January 6, 2017, Los Angeles Sheriff's Deputy Roman Krajewski responded to the scene of a residential shooting in DDC territory at 2080 Goodall Avenue in Duarte.  Krajewski observed several bullet holes in the home's front window and in a vehicle sitting in the driveway.  No one was injured in the shooting.

IV.    *Cell Phone Evidence After the Duarte Shooting (January 6, 2017, 9:05 p.m. to 11:54 p.m.)*

Cell phone data showed that at 9:05 p.m., minutes after the Duarte shooting was reported, Daniels' cell phone used the Meridian Street tower in Duarte, and then used towers consistent with travel north of Meridian Street toward interstate 210, and westward travel along the highway between 9:07 and 9:14 p.m. toward Pasadena.  During that period of time, Daniels made or received calls or standard text messages from Barnes and Lee (whose phone at the time was located in La Verne).[8]  At 9:09 p.m., Lee sent a standard text message to Barnes.

As Daniels moved around Pasadena between 9:15 p.m. and 10:26 p.m., he made or received phone calls or standard text messages from Barnes (whose phone used the Meridian Street tower in Duarte) and Robinson (whose phone also used the Meridian Street tower).  At 9:28 p.m., Barnes made an outgoing call to Lee (whose phone at the time was still located in La Verne).

---

[8]    The cellphone data lists outgoing and incoming calls and standard text messages in Coordinated Universal Time (UTC).  Special Agent Nam testified that UTC time is converted to Pacific Standard Time by subtracting eight hours.

Around 11:00 p.m., the phones of Daniels (11:15 p.m.), Robinson (11:08 p.m.), and Lee (11:05 p.m.) used the Meridian Street tower. Barnes' phone used the Meridian Street tower around 11:24 p.m.

Then, between 11:26 and 11:27 p.m. (the last time his phone used a cellular tower on January 6, 2017), Lee's phone used towers located along interstate 210 consistent with westward movement from Duarte toward Pasadena. At 11:34 p.m., Robinson's phone used a cellular tower along interstate 210 in Pasadena serving an area north of the highway (a coverage area near the site of the Vigil shooting). Between 11:43 and 11:51 p.m., Barnes' phone used a cellular tower in Pasadena covering 87 West Claremont Street. Between 11:53 and 11:54 p.m., Daniels' phone used cellular towers along interstate 210 in Pasadena serving an area north of the highway (a coverage area near the site of the Vigil shooting).

The Vigil shooting occurred at 87 West Claremont Street at or shortly before 11:51 p.m. The address 87 West Claremont is part of the Kings Villages complex that is positioned between Fair Oaks Avenue and Sunset Avenue.

V.    *The Vigil Shooting (January 6, 2017, 11:51 p.m.)*

On the evening of January 6, 2017, a candlelight vigil was held for Brandon Douglas at the Kings Villages complex. It began at a location on Fair Oaks in Pasadena, and later some participants moved to 87 West Claremont, the location to which police responded after receiving the 11:51 p.m. report of a shooting.

Janell Lipkin (one of the two attempted murder victims in the shooting) arrived at the vigil on Fair Oaks sometime after 9:30 p.m. There, she saw the

10

people who would later become the remaining victims in the Vigil shooting: the other attempted murder victim, Shamark Wright, and the two murder victims, Antoine Sutphen (also known as "Mudder") and Ormoni Duncan. Also present was a man Janell knew only as Khy, as well as Lawana Lipkin (Janell's sister), Leonard Howard (Douglas' friend who provided information in the Douglas murder investigation), and Larinisha Fernandez.

The witnesses at trial provided different perspectives of the events of the shooting.

### a.    *Kennard Crawford*

Shortly before the shooting, Kennard Crawford, who had not attended the vigil, was walking his blue bicycle northbound on Fair Oaks Avenue after passing Claremont Street, when a car resembling a Honda Accord pulled up next to him. An African-American man inside the car "banged on him," stating, "What's up cuz?" (a question used by Crips gang members to acknowledge one another). The person in the front passenger's seat was wearing a blue bandana on his face. The car drove away westbound on Claremont Avenue in the direction of Kings Villages. Scared, Crawford called 911 to report the presence of gang members. Within minutes, Crawford heard gunshots, after which a police dispatcher called to make sure Crawford was safely at home.

### b.    *Larinisha Fernandez*

As shown by the evidence at trial, a sidewalk and metal fence are located on the north side of West Claremont Avenue at the section of Kings Villages that includes 87 West Claremont. Between the north sidewalk and apartment buildings is a grassy area with trees. A concrete walkway

11

connecting the sidewalk to the apartment buildings bisects the metal gate and grassy area, and continues north from the buildings to a parking lot.

Larinisha Fernandez testified that she hung out at Kings Manor, had gone to school with Douglas and Duncan, and associated with PDL and other Bloods gangs. Fernandez attended the candlelight vigil for Douglas, which was initially held on Fair Oaks and later moved to the complex at 87 West Claremont. While sitting in her parked car with a friend on Claremont Avenue, Fernandez saw two cars approaching from Fair Oaks Avenue. The first car resembled a black truck or van; the second car resembled a four-door Honda. The cars approached with their front lights turned off. Fernandez stayed inside the car and covered herself as "a lot" of shots were fired.

### c. *Janell Lipkin*

Janell Lipkin testified that she was standing in the grassy area of the apartment complex near a tall, slanted tree when she saw four-to-five Black men inside a sport utility vehicle in the middle of Claremont Avenue. The men started shooting as a second car pulled up behind them. Janell dove to the grass and saw bullets strike the ground. During the shooting, a man in the second car yelled out "[f]uck slobs" (the term "slobs" being, according to Detective Thomas, a derogatory term that DDC gang members use to refer to PDL members). Both vehicles drove away toward Sunset Avenue. Janell sustained gunshot wounds to her legs, lung, kidney, and back.

### d. *Leonard Howard*

Leonard Howard testified that he, Antoine Sutphen, and Ormoni Duncan were, like Janell, standing next to a tall, slanted tree when the shooting commenced. Howard saw a few cars driving slowly on

12

Claremont Avenue before one person in the last car began shooting. In response, Howard ran around the corner of one of the apartment buildings. When the shooting stopped, Howard looked back and saw that Duncan had been shot in the neck. Howard also saw Sutphen and Janell lying on the ground. Howard went over and held Sutphen in his arms until paramedics arrived.[9] Sutphen died from a single bullet that penetrated his back, lung, and heart, and exited through his chest.

### e.    *Shamark Wright*

Shamark Wright testified that he had seen Sutphen, Duncan, Lawana Lipkin, the man named Khy, and another man named Dijon at the relocated vigil on 87 Claremont Avenue. While standing near the concrete walkway behind a slanted tree, Wright heard someone say, "get down." When he hit the ground, Wright heard different tempos of gunshots. Sutphen was on the ground two feet away from him. As soon as the shooting stopped, Wright ran toward the back of the apartment complex and parking lot, at which time he realized he had been shot in the leg. He then saw Lawana's car approaching.

### f.    *Lawana Lipkin*

While walking to her parked car north of the apartment complex, Lawana Lipkin heard gunshots. She began driving away, but stopped after seeing Wright and Duncan (both of whom had been wounded) running toward her. Duncan got into the front passenger seat. Wright got into the rear seat

---

[9]    While waiting for the paramedics, Howard discarded a .25-caliber firearm he had been carrying. Officers collected the firearm and a .9 millimeter Ruger from the scene. Both firearms were non-operable and were later excluded as candidates responsible for firing cartridge cases collected at the scene.

along with Khy and Dijon. Duncan had been shot in the neck and was thrashing about inside the car. As Lawana was driving toward a local hospital, Duncan jumped into the backseat. As he did so, he kicked the car out of drive, and Lawana lost control. The car crashed into a tree. Investigators later found Duncan's body on the right front passenger floorboard. He died from a single gunshot wound to the neck.

VI. *Video Evidence After the Vigil Shooting (January 6, 2017, 11:52 p.m.)*

Investigating officers obtained video surveillance from businesses located along the Lincoln Avenue corridor, which is approximately one mile northwest of 87 West Claremont Avenue. In close proximity to the intersection of Lincoln Avenue and Howard Street is an onramp to eastbound interstate 210 from Howard Street. If driving north on Lincoln Avenue, a car must turn left onto Howard Street before turning right onto the highway onramp.

In footage shown to the jury, around 11:52 p.m. on January 6, 2017 (one minute after police received a shots-fired call), three cars were recorded traveling northbound on Lincoln Avenue in the direction of Howard Street. One of the vehicles—a tan four-door sedan—turned left against a red light at the intersection of Lincoln Avenue and Howard Street.

VII. *Cell Phone Evidence After the Vigil Shooting (January 6-7, 2017, 11:52 p.m.–12:06 a.m.)*

Between 11:52 p.m. and 11:53 p.m. (the same time the tan four-door vehicle was captured on video), the cell phones of Daniels and Barnes used a

14

cellular tower covering the intersection of Lincoln Avenue and Howard Street. The cell phones of Daniels, Barnes, and Robinson used cellular towers consistent with eastward movement along interstate 210 from Pasadena toward Duarte between 11:54 p.m. and 11:56 p.m. At 11:54 p.m., and while both phones used cell towers located in Pasadena, Daniels' phone made an outgoing call or sent a standard text message to Robinson's phone.

Beginning around 12:00 a.m. January 7, 2017, the phones of Daniels, Robinson, and Barnes used cellular towers in Duarte. Then, between 2:00 a.m. and 2:28 a.m., the phones of Daniels, Lee and Robinson used the same two cellular towers covering areas in Fullerton.

VIII. *Google Evidence After the Vigil Shooting (January 7-30, 2017)*

On January 7, 2017, Lee entered Google searches for "Pasadena shooting this morning," and "Duarte shooting Goodall Avenue" (the Duarte shooting). On January 9, 2017, he searched Google for, inter alia, "Glock 19 cleaning and lubrication"; and on January 30, 2017, he entered various searches for maintaining and replacing parts on Glock firearms (which we discuss in more detail below).

IX. *Crime Scene Investigation of the Vigil Shooting*

Forensic specialists Katie Sullivan (who had investigated the Douglas shooting) and Alex Padilla responded to the scene and collected over 20 fired cartridge cases, the majority of which were found underneath a parked car on the north side of 87 West Claremont Avenue.[10] Several of the cases collected from the street and underneath the car were .40 caliber and .9 millimeter.

---

[10] Sullivan observed strike marks and damage to the car.

The specialists also collected several .9 millimeter cartridge cases from the interior and exterior of the apartment complex.

Multiple projectiles (spent bullets and fragments) were collected from the scene. Bullet strike marks were found on the exterior wall of an apartment building, a tree located in the grassy area, and the south-facing side of the metal fence.

Based on groupings of collected cartridge cases, senior criminalist April Whitehead concluded that five different firearms had been used during the shooting, including one .40 caliber Smith & Wesson firearm, one .45 caliber firearm, and three .9 millimeter firearms. One grouping of .9 millimeter cases was consistent with being fired from a Glock handgun.

X.   *Ballistic Evidence Connecting Both Shootings*

Senior criminalist Davis compared a .40 caliber cartridge case collected at the Douglas shooting to the same caliber case collected from the Vigil shooting. She determined that the same .40 caliber firearm had been used during both shootings, a finding later confirmed after senior criminalist Davis compared projectile evidence from both scenes.

XI.   *Subsequent Conduct by Daniels and His Codefendants*

On January 14, 2017, Robinson sent another Facebook subscriber a direct message wherein he stated, "We are goin at it wit [*sic*] the Lanes [a reference to PDL] though. . . . We made history." Detective Thomas testified that the statement "we made history" was made in reference to DDC's enhanced status in the community.

In March 2017, investigating officers obtained court approval to wiretap the phones of Daniels and his codefendants. Recordings of various

16

monitored phone conversations were played for the jury. During a March 18, 2017 conversation, Daniels asked Lee if he was "trynna rock," who replied, "Yep, if you put in some work before then." Daniels stated, "Man, you got me fucked up," to which Lee replied, "[y]ou got yourself fucked up nigga." He continued, stating, "You got the set fucked up." Daniels responded, "no, the set got me fucked up, my nigga. [¶] . . . [¶] The set must don't kn-, I'm the last nigga that ever hit some cheesies nigga."[11] Lee stated, "So, we ain't talkin' about them right now," and "niggas been layin' down." He continued, "niggas ain't doin' nothin' no more. [¶] . . . [¶] Yeah, well, it's up to us to finish doin' shit then." Lee stated, "if we ain't applyin' no pressure they ain't gonna do shit. So that's—that's what we gotta do." He told Daniels that they "need to have a little powwow with ourselves, and then we go—and we go do exactly that, cuz, press everybody to go do somethin' cuz, from the top to the bottom, like, we gotta . . . press all the niggas that's young and active or these niggas with burners and all we—we gotta push 'em, cuz, we gotta push them . . . in the fields.[12] You know? I mean we done did it already." Lee repeated, "We done did it," before stating that he would remember who would be "willin' and ready to slide, cuz." The term "slide" refers going into someone else's territory for a confrontation.

To "stimulate" chatter among Daniels and his codefendants, the police released certain information on the shootings to the press. On March 20, 2017, the first release summarized the Vigil shooting and gave descriptions of four suspects involved. During a phone conversation with an unidentified

---

[11]     According to Detective Thomas, DDC uses the term "cheesies" to refer to Hispanic gang members.

[12]     According to Detective Edgar Sanchez, another investigating officer in this case, a "burner" refers to a gun.

17

man the following day, Daniels asked if the police had provided a description of any cars.

In the late morning of March 23, 2017, the police released a composite sketch of Robinson as a potential suspect in the Vigil shooting. During a phone call around 7:00 p.m. the same day, Robinson asked Barnes, "How that shit look just like me?" Barnes replied, "But I say I think . . . you know, Mudder, is—it's got something to do with Mudder." Robinson continued, "but for sure they don't got nothin' cuz because a nigga ain't did nothin'. They gotta—they gotta prove that I did that shit man. How the fuck that sketch look just like me?" Barnes responded, "That's what I'm sayin'. I take it, you already know the deal, I went through it. You know the deal fool."

During a call three days later, Robinson told Barnes that the composite sketch had been posted to Facebook "to see if anybody that was there gonna say yeah I know that face." He then said "PDL (unintelligible) they not sayin' nothing." Barnes replied, "there ain't nobody talking about that game you hear me?" Robinson then stated that he had talked to another person ("Young Ace") and "told him not to get on the phone," and that Young Ace knew "not to say nothing, you feel me?" Robinson stated that "people shouldn't say, nobody should [say] nothing to nobody." In reply, Barnes stated, "Like nigga don't even like figure it out, I'll be, like, man so I don't know. I just say nigga I don't know; you know?" Robinson agreed, but stated, "They got my name, they got all that shit. They just need the Pasadena to confirm that it's me." Barnes stated, "They don't know if you hopped out or walked up so it's, like, how do they know what your face look[s] like?"

On March 30, 2017, the police released a flier depicting a photograph of one of the vehicles appearing on video surveillance. Next to the photograph

of the vehicle was a stock photograph of a Buick sedan. That afternoon, Daniels spoke with a man known only as "Bo" over the phone about the flier. Daniels told Bo that the flier depicted the "same kind of make and model of my car." When Bo inquired whether the car was in his name, Daniels stated, "Yeah it is, it's in my name though." Daniels then asked Bo if he should "paint my car tomorrow." Bo stated he needed to "think real quick," at which point Daniels stated, "all they got like is a picture of the back of it," and "I didn't have no license plates on it Bo." Later that evening, Daniels spoke to Corey Fluker and John W. Robinson over the phone. During the call, Daniels told both men that the picture was "blurry." John W. Robinson interjected, stating: "Hey. Fool, listen. . . . You need to just go to Wawa (Phonetic) and just get rid of that." Daniels agreed, stating that he would sell or trade his "game" the following day.[13]

Also that day, Pasadena Police Officer Dustin Gomez (one of the lead investigators in this case) was working at his desk at the police station when he received a phone call from a man who would not provide his name. Officer Gomez, who had listened to many of the conversations recorded on the wiretap, recognized the voice as that of Daniels. During the call, Daniels reported that he had heard about the shooting and recognized the car. Daniels told Officer Gomez that the car was not a brown Buick as was listed in the press release, but a different car: a rusted Chevrolet LeSabre with Arizona license plates.

---

[13]     John W. Robinson was charged in this case with one count of accessory after the fact (§ 32; count 7), and possession for sale of cocaine base (Health & Saf. Code, § 11351.5; count 8). He was not tried alongside Daniels and his codefendants. The jury in this case was instructed not to speculate about or consider counts 7 or 8.

Police released another flier on April 10, 2017, this time describing a fifth suspect.  Around 5:30 p.m. the same day, Lee told Daniels over the phone that they "need to sit down and talk and put they heads together."  Defendant Daniels replied, "Yeah.  TS.  If it say I got . . . my game before the shit happened  [¶]  . . .  [¶]  I'm good right?  On my—like on the registration paper?"  Also that day, Daniels told a man named Reginald Ellison over the phone that the police "put another sketch out, cu[z].  They put another description out and one of the descriptions is my size."  Daniels asked Ellison to "[c]hange the [color or] something.  They . . . lookin' for a brown Buick, Reggie."

Barnes and Lee spoke on April 11, 2017.  When Barnes began speaking about various unidentified text messages, Lee cut him off and stated, "I don't got nothing to talk about."  He then stated, "I ain't gonna talk about none of it, cuz.  Like, if niggas ain't—you know, if niggas ain't talkin' about gettin' at these snitches cuz, it's nothin'.  I don't wanna talk about nothin' else."  Then, Lee stated, "it's fucked with the police talkin' about—it's too late for all of that.  They already got what they got.  They already doin' what the fuck they doin', so fuck worrying about them.  The only thing . . . [¶] . . . to worry about now is . . . that—circle get-together."  Barnes asked, "when can we link up and talk about that?"  Lee replied, "whenever it's convenient, we around each other somewhere—we're around the same area or something you know."

On April 11, 2017, Officer Gomez received another call from a person he later identified as Daniels.  The caller, who identified himself as "William Shamburger," stated that he had witnessed the Vigil shooting.  Daniels stated that the shooting "was an inside job" by another gang, the Squiggly Lanes.  He identified two cars that were involved in the shooting: a brown Mercury and a black Suburban.  He continued, "I don't think the second

20

vehicle was the one that did the shooting sir, it wasn't the—the Buick sir, I mean the Mercury, or what do you guys say. . . . Yeah that's a Mercury sir, to me. I seen the front of it." He also said that one of the victims named "Antoine" (in reference to Antoine Sutphen) had recently killed a member of the Squiggly Lanes in Las Vegas. Daniels stated that the Squiggly Lanes had placed a hit on Antoine.

Barnes and Robinson spoke again on April 14, 2017. During the call, Robinson asked if Barnes had spoken with "fat nigga" (Daniels' gang monikers were "Fat Daddy" and "Fat Boy") to "figure out where his head [is] at."

On April 26, 2017, Officer Gomez went to an apartment complex parking lot in the City of Los Angeles where he met with Reginald Ellison, the person whom Daniels had asked to change his car's paint color. A Buick Century was located at the parking lot. Suspecting the car could be Daniels',[14] Officer Gomez impounded the car and executed a search warrant. Ellison provided Officer Gomez with the certificate of title to the car. The certificate matched the vehicle identification number, and listed a transfer of ownership from Daniels to Ellison on January 5, 2017—one day before the Vigil shooting. After the Buick Century was impounded, two forensic specialists assisted Officer Gomez in processing and photographing the car. At the request of Officer Gomez, one of the forensic specialists scratched off the topcoat of the car's exterior paint, revealing a tan or brown colored coat of paint underneath, which was consistent with the description of the vehicle

---

[14] Pasadena Police Department Detective Jason Cordova testified that he personally observed Daniels driving a brown Buick sedan on March 5, 2017. The license plate number that Detective Cordova had recorded matched the number on the car Officer Gomez saw in the apartment complex parking lot.

used during the Vigil shooting.  During a search of the car, Officer Gomez retrieved Daniels' credit card from underneath the car's driver's seat.

In phone conversations on April 28, 2017, Lee coordinated with Vasquez and Barnes about meeting at a fast-food parking lot in Azusa.  Several officers responded to the parking lot and conducted surveillance.  The officers observed Vasquez, Lee, Barnes, and Robinson inside a blue sedan.  The officers then watched as Barnes and Vasquez got out of the vehicle and drove away in separate cars.  Lee and Robinson drove away in the same blue sedan.

Following Lee's arrest on June 1, 2017, officers seized from his home four hats (one Washington Nationals hat, one blue hat with a lowercase "d," and two blue Detroit Tigers hats) and a gold chain with a lower case "d" emblem.  Detective Thomas testified that DDC adopted logos from the Detroit Tigers and Washington Nationals.  He also testified that DDC used the City of Duarte's logo—a lowercase "d" with an arrow on the end.

Barnes was also arrested at his home on June 1, 2017.  Pursuant to a search warrant, officers seized and downloaded data from five cellular phones found inside his home.  Officer Gomez testified that one photo saved on the phones showed Robinson, Barnes, and Lee standing next to each other.  Another photo depicted Barnes' haircut, which included references to "2100" (the 2100 block of Felberg Avenue is in Duarte) and a lower case "d." A series of five photographs in a collage depicted the burning of a red "doo-rag" while someone held a blue hat with a "d" emblem.

Daniels was arrested by United States Marshals in rural Mississippi in September 2017.  Officer Gomez was present for the arrest.

On August 10, 2017, Los Angeles Sheriff's Deputy Jose Garcia was working his shift inside a Los Angeles County jail when he came into contact

with Lee. Deputy Garcia asked Lee where he was going. Lee reached into his pocket and produced a pass. As he did so, another piece of paper fell out of his pocket. Garcia recognized the piece of paper as a "kite," a term used to describe written messages that inmates pass to each other in the jail. The kite stated in part, "From your home put Brandon's death spot into your Goggle [*sic*] map and see the distance."

B.    *Defense Evidence*

Daniels, Vasquez, Lee, and Barnes presented no affirmative evidence in their defense. Robinson's only witness was Officer Gomez, whom he recalled to the stand for reasons not relevant to the issues in this appeal.[15]

## DISCUSSION

A.    *Kill Zone Instruction for Attempted Murder Counts*

Daniels contends the court erred in instructing the jury on the "kill zone" theory of attempted murder under *People v. Canizales* (2019) 7 Cal.5th 591 (*Canizales*). Consistent with our prior decision in *Lee*, we agree the evidence was insufficient to warrant such an instruction but find the error harmless.

I.    *Relevant Theories of Attempted Murder*

Attempted murder requires the specific intent to kill the victim(s) and the commission of a direct but ineffectual act toward completing the killing. (*People v. Sanchez* (2016) 63 Cal.4th 411, 457.) As relevant here, there are

---

[15]    Counsel for Daniels cross-examined Officer Gomez as to his interview with Kennard Crawford, who reported that the car that had approached him had tinted windows, which was consistent with Officer Gomez's interview of Larinisha Fernandez.

two scenarios in which a defendant concurrently intends to kill multiple victims.  (See *People v. Stone* (2009) 46 Cal.4th 131, 141 (*Stone*); *People v. Bland* (2002) 28 Cal.4th 313, 329 (*Bland*).)  "The two theories are mutually exclusive."  (*People v. Foster* (2021) 61 Cal.App.5th 430, 441, fn. 16 (*Foster*).)

Under one scenario, a defendant intends primarily to kill a specific victim while concurrently intending to kill others within a zone of fatal harm or "kill zone."  (*Canizales, supra,* 7 Cal.5th at p. 603; *Bland, supra,* 28 Cal.4th at p. 329.)  The Supreme Court in *Canizales* narrowed the circumstances in which courts may instruct on this kill zone theory.  The Court held that the kill zone theory applies only when "(1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death . . . and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm."  (*Canizales,* at p. 607.)  Under the kill zone theory, the defendant must have a primary target.  (*Ibid.*)

Another scenario of concurrent intent exists when a defendant indiscriminately fires into a group of people with the intent to kill "a random person rather than a specific one"; a primary target is "not required" under such scenario.  (*Stone, supra,* 46 Cal.4th at pp. 140, 141; accord, *Canizales, supra,* 7 Cal.5th at p. 604 ["a defendant who fires into a group of people intending to kill one of them, but not knowing or caring which one he or she kills, can be convicted of attempted murder because there is no requirement that a defendant intend to kill a specific target, so long as he or she intended

24

to kill someone"].)  Under this theory, the defendant need only intend to kill "anyone who got in the way of his bullets." (*People v. Thompkins* (2020) 50 Cal.App.5th 365, 396 (*Thompkins*), disapproved on another ground in *In re Lopez* (2023) 14 Cal.5th 562, __ [526 P.3d 88, 104] (*Lopez*); see *Foster, supra,* 61 Cal.App.5th at p. 440 ["[m]ultiple attempted murder convictions can be supported" by the reasoning that a defendant who acts with intent to kill in firing at group of people is guilty of attempted murder even if he or she intended to kill a random rather than a specific person].)  As our Supreme Court has explained, "[a]n indiscriminate would-be killer is just as culpable as one who targets a specific person." (*Stone*, at p. 140.)

II.  *Jury Instructions and Prosecutor's Arguments on the Alternative Attempted Murder Theories (Kill Zone and Indiscriminate Attack on Random Group Members)*

The jury in this case was instructed as to both of the above theories of liability for attempted murder.

To convict Daniels and his codefendants of the attempted murders of Janell Lipkin and Shamark Wright in the Vigil shooting (counts 4 and 9), the jury was instructed that it must find beyond a reasonable doubt that Daniels and his codefendants intended to kill a person, and that they took at least one direct but ineffective act toward killing that person.  (Former CALCRIM No. 600 (2013 re-rev.).)  The theory of an indiscriminate attack on random persons at the vigil with the intent to kill any or all of them falls within this general instruction.

The jury was further instructed pursuant to former CALCRIM No. 600 as follows: "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.' In order to convict the defendant of the attempted murder of Janell Lipkin

and Shamark Wright, the People must prove that the defendant not only intended to kill Antione [*sic*] Sutphen and Ormoni Duncan but also intended to kill everyone within the kill zone. If you have a reasonable doubt whether the defendant intended to kill Antione [*sic*] Sutphen and Ormoni Duncan by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Janell Lipkin and Shamark Wright."

The prosecutor argued to the jury the following: "You don't have to find that [the defendants] intended to kill anyone specific but that they actually saw a person, and they intended to kill a person." The prosecutor continued:

> "You will see that there's some instruction about the kill zone theory. So another theory where you can find them guilty of the attempted murders of Shamark Wright and Janell Lipkin is if, for example, you thought they didn't see who they were shooting at, but they were intending to kill Antoine Sutphen and Ormoni Duncan, and while they were shooting at Antoine Sutphen and Ormoni Duncan, they sprayed the entire area with shots to kill everyone in that zone. And if Janell Lipkin and Shamark Wright were in that zone, then the defendants would be guilty of attempted murder under a kill zone theory; that they, essentially, created a kill zone where they intended that everyone in that zone die. . . .

> "So either way, if you believe that [the defendants] saw Janell, saw Shamark and targeted them and tried to kill them and just didn't succeed, they would be guilty of attempted murder, or if you just thought that they sprayed the entire area, trying to kill everyone in that area and Janell and Shamark were there, then they would also be guilty of attempted murder."

Thus, the prosecutor provided the jury with alternative theories of liability for attempted murder: (1) Daniels' intent to kill random people at the vigil, with no particular primary target; and (2) the "kill zone" theory in which Daniels and his codefendants primarily targeted

26

Sutphen and Duncan but concurrently intended to kill everyone in Sutphen's and Duncan's immediate vicinity to ensure the deaths of their primary targets.

III. *The Kill Zone Instruction was Not Supported by Substantial Evidence*

We agree with Daniels that the "kill zone" theory was factually unsupported in this case. Nothing about the circumstances surrounding the Vigil shooting suggests that the defendants knew Duncan or Sutphen before the Vigil shooting or that the defendants intended to kill Duncan and Sutphen by creating a fatal zone of harm. No evidence was introduced to suggest Daniels and his codefendants had any particular primary target in mind. On the contrary, the decedents Duncan and Sutphen sustained fewer gunshot wounds than the surviving victims, Janell Lipkin, the victim closest to the shooters, and Shamark Wright. No evidence established a motive to kill a particular individual as opposed to any person gathered in the grassy area of the Kings Villages, an area where PDL gang members congregated.

"It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129 (*Guiton*).) Our Supreme Court has distinguished between two categories of incorrect theories of guilt in jury instructions: *factually* inadequate versus *legally* inadequate theories. (*People v. Aledamat* (2019) 8 Cal.5th 1, 7 (*Aledamat*), citing *Guiton,* at p. 1128.) "'If the inadequacy of proof is purely factual, of a kind the jury is fully equipped to detect, reversal is not required whenever a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground.'" (*Aledamat*, at p. 7, quoting

27

*Guiton,* at p. 1129; see *Guiton*, at p. 1127 ["if there are two possible grounds for the jury's verdict, one unreasonable and the other reasonable, we will assume, absent a contrary indication in the record, that the jury based its verdict on the reasonable ground"].) When an instruction is *legally* invalid as opposed to factually unsupported, the jury is not equipped to detect the inadequacy, and thus, as discussed further below, a more stringent standard applies in order for the error to be found harmless. (*Aledamat*, *supra,* 8 Cal.5th at p. 8.)

Here, the jury was "fully equipped to detect" the fact that no evidence had been presented to them that Duncan or Sutphen, or anyone else in particular for that matter, were the defendants' primary targets in the Vigil shooting. Because the record contains no indication that the jury relied on the factually unsupported kill zone theory in finding Daniels guilty of attempted murder, we may properly assume that the jury based its verdict on the factually-supported and legally valid alternative theory that Daniels and his codefendants fired indiscriminately into the vigil crowd in order to kill as many people as possible.

IV. *The Kill Zone Instructions Were Not Legally Incorrect*

Daniels contends, however, that the kill zone instructions were not only factually unsupported but also legally unsound. In the event the jury was instructed with both a legally inadequate theory and a valid theory, we apply the standard of prejudice established by *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). (*Aledamat, supra,* 8 Cal.5th at p. 13.) Under this standard, the giving of one valid and one legally invalid instruction may be found harmless where "any

28

rational juror who made the findings reflected in the actual verdict and heard the evidence at trial would also have made the findings necessary to support [the] valid theory." (*Lopez, supra,* 14 Cal.5th at p. __ [526 P.3d at p. 108].)

We first consider whether the jury was given legally invalid kill zone instructions. To determine whether "a legally inadequate theory was conveyed to the jury here, we must ask whether there is a '"reasonable likelihood"' that the jury understood the kill zone theory in a legally impermissible manner. [Citations.] In doing so, we consider the instructions provided to the jury and counsels' argument to the jury." (*Canizales, supra*, 7 Cal.5th at p. 613.)

The jury received an instruction requiring an intent to kill two primary targets (Sutphen and Duncan), the creation of a "'kill zone,'" an intent to kill everyone within that fatal zone of harm, and an intent to kill two primary targets by killing everyone within that fatal zone of harm. This instruction, although given prior to *Canizales*, properly instructed the jury on both prongs of the test formulated in *Canizales*.

Daniels argues that the same instruction given in the instant case pursuant to former CALCRIM No. 600 (2013 re-rev.) was given to the jury in *Canizales*, and that the instruction was found legally inadequate in that case. Although we agree the kill zone instruction given in this case was similar to the one given in *Canizales*, we do not agree that the similarity in the instruction compels the conclusion reached in *Canizales* that the jury understood the kill zone instruction in a legally impermissible manner.

*Canizales* centered around a gang-related shooting at a neighborhood block party. (*Canizales, supra,* 7 Cal.5th at p. 598.) Unlike in the instant case, the evidence demonstrated that the defendants verbally identified a specific primary target, a man named Denzell Pride, when they approached

the scene and began shooting at the group of 10 to 30 people dancing and partying on the sidewalk. (*Id.* at pp. 598–599.)

Besides the attempted murder count as to Pride, the prosecution charged the defendants with the attempted murder of Pride's companion, Travion Bolden. (*Canizales, supra,* 7 Cal.5th at pp. 598, 601.) The prosecutor offered two alternative theories of the defendants' liability for the attempted murder of Bolden: (1) that one of the defendants was specifically shooting at, and attempting to kill, Bolden in addition to Pride, or (2) a "kill zone" theory as to Bolden. The prosecutor "told the jury that '[i]f they're shooting at someone and people are within the zone that *they can get killed*, then you're responsible for attempted murder as to the people who are within the zone of fire. Okay. So there were times when [Bolden] told you that he was with [Pride], near [Pride], close proximity to [Pride]. So they're both within the zone of fire, the range [of] the bullets that are coming at them.'" (*Id.* at p. 601, italics added.) The jury found the defendants guilty of the attempted murders of both Bolden and Pride.

The Supreme Court found the kill zone instructions should not have been given because there was not substantial evidence from which the jury could conclude the defendants intended to kill everyone (including Bolden) within the "kill zone." (*Canizales, supra,* 7 Cal.5th at pp. 609–610.) The Court concluded the evidence concerning the circumstances of the attack did not support a reasonable inference that the defendants intended to create a zone of fatal harm around the primary target Pride. (*Id.* at p. 610.) In particular, the evidence showed only a limited number of shots fired (five) from a substantial distance away (160 feet), and the attack occurred on a wide city street as opposed to a more confined area. (*Id.* at p. 611.) The

Court's primary concern was that the jury could find the defendants guilty of attempted murder as to Bolden even if they did not find the defendants acted with an intent to kill everyone (including Bolden) in the kill zone, but rather found the defendants acted only with conscious disregard of the risk that Bolden would be seriously injured or killed in the course of targeting Pride. (*Id.* at pp. 596, 609.)

*Canizales* did not find that former CALCRIM No. 600 itself misstated the law or was constitutionally infirm. (See *Canizales, supra*, 7 Cal.5th at p. 598 ["In light of our conclusion that the judgment must be reversed because the evidence was insufficient to support an instruction on the kill zone theory, we need not address defendants' constitutional challenge to [former] CALCRIM No. 600"].) Rather, consistent with the proper standard of review, the Court addressed *both* "the instructions provided to the jury and counsel's argument to the jury" to determine whether the jury received a legally inadequate theory. (*Id.* at p. 613.)

Turning first to former CALCRIM No. 600, the Court cautioned that the standard instruction "should be revised to better describe the contours and limits of the kill zone theory," reasoning that "[b]eyond its reference to a 'particular zone of harm,' the instruction provided no further definition of the term 'kill zone.' Nor did the instruction direct the jury to consider evidence regarding the circumstances of defendants' attack when determining whether [they] 'intended to kill [their primary target] by killing everyone in the kill zone.'" (*Canizales, supra*, 7 Cal.5th at pp. 609, 613.)[16]

---

[16] In particular, the court held the jury should be directed to "consider the circumstances of the attack, including the type and extent of force used during the attack, to determine the scope of that zone and whether the alleged victim was within the zone." (*Canizales, supra*, 7 Cal.5th at p. 612.)

Turning next to the prosecutor's discussion of the theory in closing arguments, the Court found it had "substantially aggravated the potential for confusion" on the jury's part. (*Canizales, supra*, 7 Cal.5th at p. 613.) The prosecutor's statement that the kill zone is "an area in which people '*can get killed*' or are in a 'zone of fire' was significantly broader than a proper understanding of the theory permits," and "it essentially equated attempted murder with implied malice murder." (*Id.* at p. 614, italics added.) The court determined "the prosecutor's argument had the potential to mislead the jury to believe that the mere presence of a purported victim in an area in which he or she could be fatally shot is sufficient for attempted murder liability under the kill zone theory. So misled, the jury might well have found factual support for what was effectively an 'implied malice' theory of attempted murder without detecting the legal error." (*Ibid.*)

The combination of the trial court's error in instructing on the factually unsupported kill zone theory, "the lack of any clear definition of the theory in the jury instruction," and the prosecutor's misleading argument led the Court to determine there was a reasonable likelihood the jury understood the kill zone instruction in a legally impermissible manner. (*Canizales, supra,* 7 Cal.5th at p. 614.)

Unlike in *Canizales*, nothing in the relevant jury instruction or closing argument by counsel in this case suggested that the jury could convict the defendants if the shooters simply created a zone in which the victims *could* be killed. Rather, the relevant jury instruction confirmed the necessity that the shooters created a zone in which they *intended* that every person in the zone *would* be killed, and required an acquittal if the jury harbored reasonable

32

doubt "whether the defendant intended to kill Antione [*sic*] Sutphen and Ormoni Duncan *by* killing everyone in the kill zone." (Italics added.)

In addition, counsel's remarks to the jury in this case did not impermissibly broaden the kill zone theory in violation of *Canizales*, but actually reinforced the proper scope of the kill zone theory. The prosecutor informed the jury that it must find that in order to kill Sutphen and Duncan, the defendants fired gunshots "to kill everyone in that zone"; that the jury was required to find "Janell Lipkin and Shamark Wright were in that zone"; that the defendants "essentially, created a kill zone where they intended that everyone in that zone die"; and that the defendants "sprayed the entire area, trying to kill everyone in that area and Janell and Shamark were there." These statements dovetail with *Canizales*' definition of a "kill zone" as "an area in which the defendant intended to kill everyone present to ensure the primary target's death" based on "the type and extent of force the defendant used" (*Canizales, supra*, 7 Cal.5th at p. 607), and the requirement that "the alleged attempted murder victim[s] who [were] not the primary target [were] located within that zone of harm." (*Ibid.*)

Taking the jury instructions and the prosecutor's closing arguments together, we conclude that the jury received legally adequate instructions on the kill zone that required "a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*Canizales, supra*, 7 Cal.5th at p. 607.)[17]

---

[17] Following our decision in *Lee*, several appellate courts found under different factual contexts that cases involving former CALCRIM No. 600 instructed the juries in a legally impermissible manner. (See, e.g., *In re Sambrano* (2022) 79 Cal.App.5th 724, 734 [accepting Attorney General's concession under *Canizales*]; *In re Lisea* (2022) 73 Cal.App.5th 1041, 1055–1056 [modified CALCRIM No. 600 instructed the jury that if it had a reasonable doubt whether the defendant intended to kill primary targets "by

VI.  *Assuming Arguendo the Kill Zone Instructions Were Legally Unsound, the Error Was Harmless Beyond a Reasonable Doubt*

As discussed above, because the jury received a factually insufficient but legally adequate theory under the kill zone instruction, the applicable standard of prejudice is whether the record affirmatively demonstrates a reasonable probability the jury found Daniels guilty under the kill zone theory. (*Guiton, supra*, 4 Cal.4th at p. 1130.)  The record does not so demonstrate, and thus the error was harmless.

Even were we to find a reasonable likelihood that the jury understood the kill zone instruction in a legally impermissible manner, we conclude the error was harmless under the more stringent *Chapman* standard applicable in cases where a legally invalid theory was presented to the jury along with a valid theory.  We reach this conclusion under the principles recently set forth in *Lopez, supra*, 14 Cal.5th 562.

As discussed above, under that standard, "'[t]he reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt.'" (*Lopez, supra,* 14 Cal.5th at p. __ [562 P.3d at p. 109], quoting *Aledamat, supra*, 8 Cal.5th at p. 13.)  This "analysis requires a court to rigorously review the evidence to determine whether any rational juror

harming everyone in the kill zone, then you must find the defendant not guilty of the attempted murder"]; *People v. Morales* (2021) 67 Cal.App.5th 326, 339 (*Morales*) [prosecutor inaccurately explained theory]; *People v. Cardenas* (2020) 53 Cal.App.5th 102, 111, 116, fn. 8 (*Cardenas*) [same].) Because none of these cases addressed the same jury instruction or argument of counsel, we decline to extend their analyses here.

who found the defendant guilty based on an invalid theory, and made the factual findings reflected in the jury's verdict, would necessarily have found the defendant guilty based on a valid theory as well." (*Lopez, supra*, 14 Cal.5th at p. __ [526 P.3d at p. 93].) "In other words, if "'[n]o reasonable jury that made all of these findings could have failed to find'" the facts necessary to support a valid theory, the alternative-theory error was harmless." (*Lopez, supra,* at p. __ [526 P.3d at p. 109]; accord, *Aledamat*, at p. 13.)

Thus, the question we must answer is whether a reasonable jury that made all of the findings in this case could have failed to find the facts necessary to support the valid alternative theory of attempted murder of Janell and Wright. (See *Lopez, supra,* 14 Cal.5th at p. __, [526 P.3d at p. 109] ["a reviewing court essentially asks whether any rational juror who made the findings reflected in the verdict and heard the evidence at trial could have had a reasonable doubt regarding the findings necessary to convict the defendant on a valid theory"].) That valid theory required the jury to find that the defendants committed an indiscriminate drive-by shooting in which they intended to kill anyone and everyone towards whom they directed bullets during the Vigil shooting. (See *Stone*, *supra*, 46 Cal.4th at p. 141 [a defendant "*will* be guilty of attempted murder even if he or she intended to kill a random person rather than a specific one"]; accord, *Thompkins*, *supra*, 50 Cal.App.5th at p. 396, fn. 8 ["an indiscriminate shooting into a crowded room . . . could make [defendant] guilty of multiple attempted murders if it were shown that he harbored an intent to kill indiscriminately. [Citation.] He could at least be found guilty of attempting to murder the five victims he wounded when 10 shots were fired"].)

We conclude the evidence of the valid theory was overwhelming, and thus no reasonable jury could have failed to find Daniels culpable under that

theory. (*People v. Glukhoy* (2022) 77 Cal.App.5th 576, 593–596, 606 (*Glukhoy*), review dism. May 31, 2023, S274792 [finding error in instructing on legally unsound theory of liability was harmless beyond a reasonable doubt where "evidence of the valid theory was overwhelming"].) Using two separate cars, defendants ambushed a closely congregated group of people (some separated by one or two feet) under the cover of night and fired over 20 shots from five different firearms in one direction toward the group. (Compare *Cardenas, supra,* 53 Cal.App.5th at p. 116 [shooter fired directly at one victim from close range and continued firing toward that specific victim, leading to reasonable inference shooter did not intend to kill those who were not in the line of gunfire].) This evidence virtually compelled a finding that Daniels and his codefendants fired repeatedly at a group of individuals with the intent to kill *any* and *every* person in the line of fire, a theory the prosecutor correctly argued to the jury.

The prosecutor's closing argument is also "a pertinent circumstance that should be considered in determining whether an error is harmless." (*Glukhoy, supra,* 77 Cal.App.5th at p. 605.) The prosecutor focused on the same evidence in arguing both the random intent to kill vigil attendees and the kill zone theory. Thus, the jury's verdict on the attempted murder charges demonstrates that it necessarily credited the evidence that established Daniels' culpability for the indiscriminate attack on the vigil-goers, including Janell and Wright, with the intent to kill them. (See *id.* at p. 606.)

B.      *Exclusion of Evidence of Derrell Davis's Potential Involvement in the Douglas and Vigil Shootings*

Daniels has incorporated the argument raised in Lee's appeal concerning the exclusion of third-party culpability evidence regarding Derrell Davis's potential involvement in the Vigil shooting. (Cal. Rules of Court, rule 8.200(a)(5).)[18] He provides no additional argument on the issue. As we did in *Lee*, we reject this argument.

I.      *Relevant Background*

The issue of third-party culpability was handled piecemeal throughout the trial. We therefore summarize the import of the proceedings as a whole rather than discuss each procedural event as it unfolded during the trial.

To raise a reasonable doubt as to his own guilt, Lee sought to introduce evidence at trial that Derrell Davis, a documented member of the Altadena Blocc Crips (another rival gang of PDL), was somehow involved in both the Douglas shooting and Vigil shooting. Regarding the Vigil shooting, Daniels and his codefendants sought to introduce statements that Leonard Howard (one of the witnesses to the Vigil shooting) had made to the police during an interview after the shooting.[19] In one part of the interview, Howard told the police he had received threatening text messages from Davis at unspecified

---

[18]    Rule 8.200(a)(5) of the California Rules of Court provides: "Instead of filing a brief, or as part of its brief, a party may join in or adopt by reference all or part of a brief in the same or a related appeal." Subsequent unspecified references to rules are to the California Rules of Court.

[19]    Howard's interview was not introduced into evidence at trial, and is not part of the record on appeal. Statements that the defendants sought to introduce were discussed at sidebar conferences during trial.

dates. In one message, Davis sent Howard a photograph of himself holding a grenade and stating, "I could have got you, but I didn't want to. I'm going to get you the next time."[20] In another part of his interview, Howard told the police he had seen a white Dodge Charger on Fair Oaks Avenue the night of the shooting that may have been associated with Davis. Howard then told the police, "I don't know if it was really them" in reference to Davis.

The court held a first hearing to determine whether to admit the proffered evidence, and later revisited the issue throughout the trial. In substance, the prosecutor argued that while Davis's motive and opportunity to commit the Vigil shooting could be established by the proffered evidence, under *People v. Hall* (1986) 41 Cal.3d 826 (*Hall*), neither motive nor opportunity are bases on which to admit third party culpability evidence. Because the evidence did not establish Davis's role in the Vigil shooting, the prosecutor requested that the court exclude the evidence as irrelevant under Evidence Code section 352. Defense counsel argued that the evidence established not only motive, but direct evidence that Davis was present at the scene of the Vigil shooting. The court disagreed, finding the evidence did not directly or circumstantially link Davis to the perpetration of the shooting. The court excluded the evidence.

Nonetheless, at trial the court allowed defense counsel to impeach Leonard Howard through statements he had purportedly made to the police. Howard was asked whether he had told the police he had seen Derrell Davis drive a white Dodge Charger on Fair Oaks Avenue or Claremont Street the night of the Vigil shooting. Counsel also asked whether Howard had told the police that the vigil had moved after Howard saw Davis's car nearby.

---

[20] As to the written caption appearing in the photograph, the court sustained an objection based on relevance and hearsay.

Howard testified that he could not recall making these statements to the police.

II.  *Analysis*

Daniels contends his convictions on counts 1 (conspiracy to commit murder), 2 and 3 (first degree murder of Sutphen and Duncan), and 4 and 9 (attempted murder of Janell and Wright), must be reversed because the trial court erred in excluding evidence that Davis was involved in the Vigil shooting.  He also contends that the court erred by not expressly referring in its ruling to the factors set forth in Evidence Code section 352.  We reject both contentions.

To be admissible, evidence of a third person's culpability "need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt.  At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability."  (*Hall*, *supra*, 41 Cal.3d at p. 833.)  Evidence of "motive or opportunity to commit the crime in another person, without more, will not suffice . . . : there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime."  (*Ibid.*)

"'[C]ourts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible ([Evid. Code,] § 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion ([Evid. Code,] § 352).'"  (*People v. Lewis* (2001) 26 Cal.4th 334, 372 (*Lewis*).)  We review the trial court's exclusion of third party culpability evidence for abuse of discretion and must affirm if the court's

ruling is correct on any ground. (*People v. Turner* (2020) 10 Cal.5th 786, 817 (*Turner*); *People v. Ghobrial* (2018) 5 Cal.5th 250, 283.)

We find no abuse of discretion in the court's ruling in this case. Notably absent from the defendants' proffer is any evidence creating a reasonable inference that Davis was somehow involved in the murders committed in the Vigil shooting. The proffered evidence merely suggested that Davis might have been in the area, was an Altadena Blocc Crips member, and had a motive to target PDL members. Nothing suggested he was actually involved in any of the relevant events. (See *Lewis, supra*, 26 Cal.4th at p. 373; *Turner, supra*, 10 Cal.5th at p. 817 ["[w]e have repeatedly upheld the exclusion of third party culpability evidence when the third party's link to a crime is tenuous or speculative"]; accord, *People v. Panah* (2005) 35 Cal.4th 395, 481; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1135–1137.) Further, even had the evidence somehow connected Davis to the shooting, there was nothing to show how his supposed involvement had a tendency in reason on the entire record—including the exceptionally strong evidence linking Daniels and his codefendants to the Vigil shooting—to exonerate all or one of them.

Finally, we find no error in the court's failure to expressly weigh the factors set forth in Evidence Code section 352. The evidence was not relevant in the first place, as it had no tendency in reason to demonstrate Davis's guilt or Daniels' innocence. In any event, invocation of the Evidence Code section 352 factors is not required if the court "clearly had the concerns of that statute in mind when excluding the evidence." (*Turner, supra*, 10 Cal.5th at pp. 817–818.) Viewing the court's ruling in context (particularly the prosecutor's request that the court exclude the evidence under Evid. Code, § 352), the court clearly had that statute in mind when making its ruling.

C.    *Errors in the Admission of Evidence*

Like his codefendants, Daniels challenges the admission of various pieces of evidence at trial. We first address his joinder to arguments raised in *Lee* concerning various social media messages.[21]

In addition, Daniels contends the trial court erred by admitting various pieces of evidence he believes are gang-related and used only to prove his and his codefendants' propensity for violence. Daniels acknowledges that defense counsel did not object to the admission of any evidence on grounds that it was improper propensity or character evidence. We therefore deem these contentions forfeited, but address the merits in the context of Daniels' ineffective assistance claim for the failure to object.

I.    *Social Media Messages*

Daniels incorporates the argument raised in *Lee* "that 'social media messages of Daniels, Robinson and Barnes were inadmissible because there was no foundation for the evidence.'" In the prior appeal, Lee argued that the certificates of authenticity for each social media account introduced at trial were insufficient to authenticate the messages appearing on each account, as "[a]nyone with the right password" could gain access to author the messages.

In *Lee*, we noted that the appellants had failed to identify any particular social media messages they believed should not have been introduced at trial. (*Lee, supra,* at p. 50.)[22] Daniels has likewise failed to

---

[21]    Trial counsel for each defendant stipulated that any objection made by one defendant would be deemed to have been made by all defendants. When discussing the relevant background, we refer to "defense counsel" for ease of reading.

[22]    We noted: "Outside of referencing 'social media messages of Daniels, Robinson and Barnes' and 'Facebook messages' in his briefs, [Lee did not

identify any social messages in this appeal. He concludes rather that the "hearsay messages at issue [in *Lee*] implicate" him individually.

Daniels' incorporated argument suffers from the very same deficiencies present in *Lee*: Absent any discussion of particular messages, and absent any objection during trial on the grounds that Daniels or his codefendants were not the authors of the social media messages, we deem the contention forfeited. (See *People v. Wong* (2010) 186 Cal.App.4th 1433, 1446–1447, fn. 9; *Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115; *People v. Abel* (2012) 53 Cal.4th 891, 924; see also Evid. Code, § 353, subd. (a).) In any event, we restate our analysis in *Lee* on the merits and reject the incorporated argument.

a.     *Governing Law*

The means of authenticating a writing are not limited to those appearing in the Evidence Code. (*People v. Skiles* (2011) 51 Cal.4th 1178, 1187.) As relevant here, section 1524.2 provides one means of authenticating electronic communications seized pursuant to a search warrant. The procedures set forth in that statute permit use of an affidavit to authenticate such records in lieu of live testimony normally required under the business record exception (see Evid. Code, § 1271). (§ 1524.2; Evid. Code, §§ 1561, 1562.)[23]

---

provide any] record citation with respect to any evidence introduced at trial." (*Lee*, *supra*, at p. 50, fn. 24.)

[23]     Section 1524.2 sets forth the procedures by which law enforcement may obtain records that are in the actual or constructive possession of a foreign corporation that provides electronic communication services or remote computing services to the general public. (§ 1524.2, subd. (b).) In response to a valid warrant, the corporation must provide an affidavit verifying the

b.    *Relevant Background*

Seeking to admit evidence of photographs and messages appearing on Facebook and Instagram accounts held by Daniels, Robinson, and Barnes, the prosecution argued the evidence was relevant to each codefendant's gang membership. Defense counsel objected to the evidence, and argued it was lacking in foundation and did not meet the requirements of the business record exception. Defense counsel also argued that a Facebook employee would have to testify to the records' authenticity. In response, the prosecution argued that certificates of authenticity, which had been obtained by an investigating officer, would provide an adequate foundation for the evidence, and the photographs and messages could be authenticated circumstantially. Subject to the prosecutor's ability to authenticate each piece of evidence, the court admitted the photographs and messages.

Detective Sanchez testified that he had authored search warrants for five different Facebook and Instagram accounts for Daniels, Robinson, and Barnes. For each account, Detective Sanchez obtained a certificate of authenticity from the law enforcement relations group for Facebook and Instagram. The certificate of authenticity for the Facebook account associated with Daniels, signed by the records custodian and dated November 2, 2017, stated:

"1. I am employed by Facebook, Inc. ('Facebook'), headquartered in Menlo Park, California. I am a duly authorized custodian of records for

---

authenticity of the records it provides, and "[t]hose records shall be admissible in evidence as set forth in Section 1562 of the Evidence Code." (§ 1524.2, subd. (b)(4).) Section 1562 of the Evidence Code provides: "If the original records would be admissible in evidence if the custodian or other qualified witness had been present and testified to the matters stated in the affidavit, and if the requirements of Section 1271 have been met, the copy of the records is admissible in evidence."

43

Facebook and am qualified to certify Facebook's domestic records of regularly conducted activity.

"2. I have reviewed the records produced by Facebook in this matter in response to the Search Warrant received November 18, 2016. The records include search results for basic subscriber information, IP logs, messages, photos, videos, other content and records for [Daniels].

"3. The records provided are an exact copy of [those] that were made and kept by the automated systems of Facebook in the course of regularly conducted activity as a regular practice of Facebook. The records were saved in electronic format after searching Facebook's automated systems in accordance with the above-specified legal process. The records were made at or near the time the information was transmitted by the Facebook user.

"4. I declare under penalty of perjury that the foregoing certification is true and correct to the best of my knowledge." Nearly identical certificates of authenticity were issued by the Facebook and Instagram custodians of records in response to search warrants for the other accounts.

Before discussing the records obtained from Facebook and Instagram, Detective Sanchez testified that each account had been password protected and registered with an email address(es), name, and phone number(s). Detective Sanchez then identified various photographs and video footage obtained from the accounts associated with Daniels, Robinson, and Barnes. Detective Sanchez also discussed several messages in which each codefendant gave out phone numbers that had been independently associated with them at trial.[24] In one direct message on January 14, 2017, Robinson told a

---

[24] In one message, Daniels told another user, "Call me," before listing a specified phone number. In another message, Barnes listed a phone number after stating, "Hey you alright? I just got back out here. . . . Hit me if you need anything." In another message, Robinson stated, "My messenger don't

44

recipient, "we are goin at it wit[h] the lanes t[h]ough. They lost three and they just took out an innocent nigga." He continued, "it's good. They down right now. We made history."

c.    *Analysis*

The certificates of authenticity for the social media accounts in this case met the requirements of section 1524.2 and Evidence Code sections 1561 and 1562. The certificates were issued by the custodians of record who certified Facebook and Instagram's "domestic records of regularly conducted activity." The custodians also identified the records as true copies of those sought in the search warrants, and attested that the records were kept in the regular course of business at or near the time the information was transmitted by each account user. The records and contents therein being properly authenticated, the prosecution was not required to further authenticate them through live testimony. (§ 1524.2; Evid. Code, § 1562.)

To the extent Daniels contends there was insufficient evidence to support a finding that he, Barnes, and Robinson authored the messages appearing in social media records, we disagree. Detective Sanchez testified that each social media account was password-protected and associated with each codefendant's name, email address, and phone number. Many of the messages appearing in the records informed other users that the author could be reached at phone numbers independently corroborated as being associated with Daniels, Robinson, or Barnes.

---

[*sic*] work unless I'm under wifi." He then listed a phone number described as "my number."

The phone numbers provided in these messages match the numbers that had been associated with each codefendant at trial.

45

All of this evidence tended to show that the codefendants created and maintained their own social media accounts. (See *People v. Valdez* (2011) 201 Cal.App.4th 1429, 1435 (*Valdez*); *People v. Cruz* (2020) 46 Cal.App.5th 715, 731.) The possibility that other people could access the accounts does not render the messages originating from them inadmissible. (See *Valdez, supra*, 201 Cal.App.4th at p. 1437 ["the proponent's threshold authentication burden for admissibility is *not* to establish validity or negate falsity in a categorical fashion"].) Any doubts concerning the accounts' ultimate authenticity went to the weight of the evidence, not its admissibility. (*People v. Goldsmith* (2014) 59 Cal.4th 258, 267.)

## II. *Failure to Object to Gang-Related and Firearm-Related Evidence Did Not Constitute Ineffective Assistance of Counsel*

Daniels contends that various pieces of gang- and firearm-related evidence was improperly admitted because the evidence was "in essence probative only of propensity" and used to prove "guilt by association." "Evidence Code section 1101, subdivision (a) sets forth the "'strongly entrenched'" rule that propensity evidence is not admissible to prove a defendant's conduct on a specific occasion." (*People v. Jackson* (2016) 1 Cal.5th 269, 299.) Daniels acknowledges that he has forfeited his propensity arguments by failing to object in the trial court below. (*People v. Pineda* (2022) 13 Cal.5th 186, 236 (*Pineda*); *People v. Partida* (2005) 37 Cal.4th 428, 431; *People v. Williams* (1997) 16 Cal.4th 153, 250 (*Williams*); Evid. Code, § 353, subd. (a).) However, he contends the convictions should nevertheless

be reversed because his trial counsel rendered ineffective assistance by failing to object.[25]

To demonstrate ineffective assistance of counsel, Daniels must show that his trial counsel's performance fell below an objective standard of reasonableness, and that he was prejudiced by trial counsel's performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) "As [our Supreme Court has] noted repeatedly, the mere failure to object rarely rises to a level implicating one's constitutional right to effective legal counsel." (*People v. Boyette* (2002) 29 Cal.4th 381, 433.) "Moreover, '[i]f the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal.' (*People v. Kraft* (2000) 23 Cal.4th 978, 1068–1069.)" (*People v. Huggins* (2006) 38 Cal.4th 175, 206.)

To begin with, Daniels has failed to develop any argument on the merits of his claim for ineffective assistance. He has not demonstrated how his trial counsel's failure to object to the various pieces of evidence, which we set forth below, fell below an objective standard of reasonableness,[26] nor has

---

[25]    To the extent Daniels asserts he preserved objections under Evidence Code section 1101 by objecting on other grounds at trial, we reject his contention. (See *Pineda, supra,* 13 Cal.5th at p. 236 [objections under hearsay and Evid. Code, § 352 did not preserve claim of evidentiary error under Evid. Code, § 1101]; *People v. Valdez* (2012) 55 Cal.4th 82, 130 (*Valdez*) [objections to gang-related evidence as to relevance, cumulativeness, foundation, and Evid. Code, § 352 did not preserve claim of error under Evid. Code, § 1101].) Nor has Daniels adequately asserted that any such objections would have been futile.

[26]    Daniels concludes, without any legal argument, that defense counsel "overlooked" an objection on propensity evidence grounds, as opposed to making "a strategic decision."

he demonstrated how this failure to object resulted in prejudice. (See *People v. Mitchell* (2008) 164 Cal.App.4th 442, 467 [deeming insufficient an argument that "merely presumes counsel's failure to object" was unreasonable and prejudicial].) We should not address a claim which Daniels has not adequately developed. (*People v. Tafoya* (2007) 42 Cal.4th 147, 196, fn. 12.)

Even addressing the merits of his claim, we conclude that Daniels has failed to establish ineffective assistance because "the present record does not preclude the possibility that defense counsel's actions were based upon reasonable strategic decisions." (*People v. Ledesma* (2006) 39 Cal.4th 641, 746.) As we shall discuss, all of the evidence about which Daniels complains was either properly admitted or non-prejudicial.

a. *Relevant Background*

The prosecution sought to introduce video and photographic evidence of gang graffiti appearing at the Community Arms and Kings Villages apartment complexes in June 2016. The prosecution argued the evidence, including a video of Daniels, Barnes, and La'Shaun Morgan (a fellow member of DDC) tagging in PDL territory and showing Daniels armed with a gun, was relevant to the defendants' motive to commit the shootings in a rival stronghold. Defense counsel objected to the evidence, and argued that the timing of the graffiti (appearing seven months before the Vigil shooting) rendered the evidence irrelevant and lacking in probative value. The court overruled the objections, finding the evidence to be relevant and probative as to the existing animus between the gangs, and as to Daniels' and Barnes' gang membership and familiarity with Kings Villages.

The prosecution introduced into evidence several photographs taken of graffiti appearing in June 2016. Pasadena Police Department Officer Trevon Sailor testified that he had taken the pictures appearing in the Community Arms apartment complex. In one picture taken of graffiti appearing between two apartment units, he identified the terms "LK [and] BK" as abbreviations for "Lanes Killer" and "Blood Killer." In other pictures, Officer Sailor identified several other terms referencing DDC and disparaging PDL, including: "Roc Crip Danga Lanes K," and "2100 Goodall Three Times Moving, WS, Duroc, Fuc Baby Ed, Mr. Danga Lanes K."[27] When shown pictures of the June 2016 graffiti at trial, the gang expert, Detective Thomas, testified that whoever wrote the graffiti were well-versed in the meanings behind the tagging. In reference to "BK," Detective Thomas testified that "it indicates that this gang that tagged this, [DDC], are killers of the Blood gangs," and use of "LK" "indicates Lanes Killers."[28] Three stripes appearing on the "L" indicated that "some act has been done to gain credibility or earn stripes."[29] Around the time Officer Sailor took pictures of this gang graffiti, Detective Thomas was on special assignment and had personally seen a lot of the graffiti in PDL territory. The graffiti depicted in the photographs at trial

---

[27] According to Officer Sailor, Baby Ed was a well-known PDL member.

[28] During a sidebar conference, defense counsel objected to the term "Blood Killer" because it was unclear if the graffiti had been tagged by a member of DDC. During a colloquy with the judge, defense counsel agreed that "Blood Killer" was a general term used by Crip sets. The court found the term "BK" in the graffiti could be "consistent" with DDC.

[29] When asked whether the act of earning stripes would have occurred before tagging the graffiti, Detective Thomas testified that it could be a possibility, "[o]r that this act [of tagging] is an act of earning credibility."

49

coincided with attacks and violence between DDC and PDL, and was consistent with graffiti used to disrespect PDL.

During his testimony, Pasadena Police Department Detective Edgar Sanchez (another investigating officer in this case) was shown a series of videos obtained from Facebook records of Daniels' account. Per the records obtained from Facebook, the videos were uploaded at the end of June 2016. One video was taken of the same gang graffiti Detective Sailor identified in June 2016 located on the north end of the Community Arms complex. Detective Sanchez identified Daniels' voice in several videos of gang graffiti appearing at the Community Arms and Kings Villages complexes. Detective Sanchez also identified three individuals in the video standing near a wall to the Community Arms apartment complex. Based on his own experience handling the investigation, Detective Sanchez identified the individuals as Daniels; Barnes, who was spray painting the wall; and La'Shaun Morgan. Detective Thomas reviewed the video at trial and testified that it "re-affirmed" his belief that Daniels and Barnes were active members of DDC.

The prosecution also requested permission to introduce photographs that had been taken in February 2017 of graffiti appearing in a CVS bathroom stall in an area claimed by DDC. The prosecution argued the evidence would be used to respond to defense counsel's questioning whether the Douglas and Vigil shootings enhanced DDC's reputation. Over defense counsel's relevance and Evidence Code section 352 objections, the court granted the request.

During redirect examination, Detective Thomas testified that he had seen photographs of graffiti in DDC territory around February 2017, which coincided with lesser attacks on the gang following the Douglas and Vigil shootings. In photographs shown the jury, Detective Thomas identified

portions of the graffiti in which DDC had taken credit for the shootings, including: "We up one," "187 All," and "Fucc Slobs."

The prosecution also sought to introduce evidence of the defendants' gang monikers and tattoos. Over defense counsel's relevance and Evidence Code section 352 objections, the court admitted the evidence, finding it relevant to gang membership and to the degree to which each defendant participated in DDC.

Detective Thomas testified that he had personally contacted the defendants in the past and knew them by their respective gang monikers. From various photographs shown to the jury, Detective Thomas identified gang tattoos on each defendant. As to Daniels specifically, Detective Thomas identified two tattoos: (1) a Bentley symbol with the letter "c" for Crip inserted and a blue background appearing on Daniels' chest; and (2) a letter "d" with blue coloring appearing on his left shoulder. Detective Thomas opined that both tattoos referenced the DDC gang. Based on the tattoos on each defendant, Detective Thomas opined that each was a member of DDC.

Detective Thomas was also shown various photographs of the defendants. In several photographs, Lee and Robinson were depicted wearing clothing and jewelry associated with DDC, including a Detroit Tigers hat, a necklace with a lowercase "d" design, and blue shoes. In one photograph, Vasquez and an unidentified man were shown standing next to Daniels, who was flashing a gang sign by extending three fingers from his right hand. This hand sign, Detective Thomas testified, was "consistent with [DDC] membership."

Detective Thomas discussed his experience with DDC, the gang's common symbols and colors, and terms used by gang members. He discussed DDC's territory or "turf," which included the 2100 block of Goodall Avenue,

51

"the heart of [DDC] territory." "Going on route" means "going somewhere to carry out some act of violence or criminal activity where you would travel from one place to another to go with something with specific intent to carry out an act." He also discussed the importance of gang retaliation and "status" within gangs. A gang member increases their status by committing acts of violence, i.e., "putting in work" or "earning stripes."

Based on his experience investigating DDC, Detective Thomas was aware of the term "going on a mission." He testified, "A mission, in my experience—I have personally investigated a crime where several members of a gang left a location in order to go to a rival's known location and commit a shooting against another rival gang." To go on a "mission," gang members "would usually congregate and communicate, if they are not together, by cellphone, by text messages, determine a place to meet, which is commonly one of the gang hangouts like [I] mentioned before, several locations on Goodall Avenue, and in my experience, I know they have been used as locations to congregate, formulate plans, and then from there, go on what is called a 'mission.'"[30] Detective Thomas continued: "So the mission itself requires planning, congregation of the members that are going to carry it out. They would gather weapons to be used on whatever type of crime they are going to perpetrate. They would have to collect weapons and then formulate a plan and then go to wherever the mission was going to take place."

Based on past investigations, Detective Thomas opined that gang members who go on these missions have different roles: there may be designated drivers, shooters, and lookouts either inside the same car as the shooter(s) or in a "follow vehicle." Once the crime has occurred, "there's

---

[30] Defense counsel objected to Detective Thomas' latter description of "going on a mission" as speculative, but the court overruled the objection.

definitely cohesiveness within the gang that people are not to talk about it. People are to keep—the gang members are made sure to keep quiet about what happened and go to great lengths to conceal the crimes that they have [committed] to avoid prosecution and retribution."

Detective Thomas testified that he had personally arrested DDC gang members who illegally possessed firearms. Detective Thomas opined that gang members obtain firearms illegally through sales or trades with other members of the gang, and he had personally seen or heard of gang members selling guns to one another. Guns that have been used in shootings frequently change hands.

Over a defense objection for relevance and Evidence Code section 352, the court admitted evidence obtained from Lee's Google subscriber information, including internet searches he had made regarding Glock firearms. Based on the subscriber information, Detective Russo testified that on January 30, 2017, Lee had entered the following internet searches: "Glock 19 cleaning and lubrication"; "how to clean a Glock at home"; "how to sand a gun barrel down"; the "best sandpaper for a Glock slide"; "looking for gun shops in Duarte"; and "price of a Glock 19 gen 3 firing pin." A Glock 19 is a .9 millimeter handgun. Based on her analysis in this case, senior criminalist Whitehead testified that a Glock handgun "could be a candidate" responsible for firing .9 millimeter cartridge cases collected at the Vigil shooting scene. She also testified that "sanding down a barrel" could refer to refinishing the barrel or changing its rifling to affect a projectile analysis.

The prosecution also sought to introduce a text message sent from Lee's cell phone to Robinson. The court overruled Lee's objections based on foundation, relevance, and Evidence Code section 352 objection, but informed the prosecution that it would have to lay a foundation for the text message.

53

Detective Sanchez testified that the wiretap of Lee's phone intercepted an April 3, 2017 text message on a line sheet used to annotate calls or messages. The line sheet identified an outgoing phone number (Lee's), incoming phone number (Robinson's), date (April 3, 2017), and time (7:49 p.m.). The line sheet listed verbatim the language appearing in the text message and included a photograph that had been attached to the message. The text message showed a photograph of four firearms with the following message (inferably referring to caliber and sales price for each of the four depicted guns): "40/450, 9/350, 380/100, 38/250."

b.    *Governing Law*

Except as otherwise provided by statute, "all relevant evidence is admissible (Evid. Code, § 351; see also Cal. Const., art. I, § 28, subd. (d)), and relevant evidence is defined as evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' (Evid. Code, § 210.) Evidence is relevant if it tends "'logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive. [Citations.]' [Citation.]" (*People v. Williams* (2008) 43 Cal.4th 584, 633–634.) Evidence that is relevant may still be excluded "if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

Evidence of "a person's character or trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove

54

his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a); accord, *Williams, supra,* 16 Cal.4th at p. 193 ["evidence of a defendant's criminal disposition is inadmissible to prove he committed a specific criminal act"].) This prohibition of evidence does not apply to evidence that a person committed a crime or other act "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity . . . ) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).)

Consistent with these evidentiary principles, evidence of a defendant's gang affiliation—including evidence of gang territory, membership, signs and symbols, beliefs and practices, criminal enterprises, rivalries, and the like—is often relevant and admissible to prove identity, motive, intent, modus operandi, or other issues pertinent to guilt of the charged crime. (*People v. Chhoun* (2021) 11 Cal.5th 1, 31 (*Chhoun*); *People v. Franklin* (2016) 248 Cal.App.4th 938, 953; see *People v. McKinnon* (2011) 52 Cal.4th 610, 655; *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049; *Williams, supra,* 16 Cal.4th at p. 193.) Gang evidence is also relevant to prove an underlying crime was committed for the benefit of, at the direction of, or in association with a criminal street gang for purposes of imposing a gang-related enhancement or special circumstance allegation.[31] (§§ 186.22, subds. (b)(1), (f), 190.2, subd. (a)(22); see *People v. Rivera* (2019) 7 Cal.5th 306, 331–332.) "However, gang evidence is inadmissible if introduced only to 'show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense. [Citations.]' [Citations.]" (*People v. Avitia* (2005) 127 Cal.App.4th 185, 192.)

---

[31] Recent legislative changes applicable to gang-related sentencing enhancements under section 186.22 are discussed in section F, *infra.*

"Even when it is relevant, however, 'courts should carefully scrutinize evidence of a defendant's gang membership because such evidence "creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged."' [Citations.]" (*Chhoun*, *supra*, 11 Cal.5th at p. 31.) "On the other hand, "'[b]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." [Citations.]' [Citation.]" (*People v. Duong* (2020) 10 Cal.5th 36, 64.) "'On appeal, the trial court's determination of this issue, being essentially a determination of relevance, is reviewed for abuse of discretion.' [Citation.]" (*People v. Lenart* (2004) 32 Cal.4th 1107, 1123.)

### c.     *Gang Graffiti*

The trial court in this case carefully considered the probative value of the various types of gang graffiti against its potential for prejudice, and ruled that the evidence was admissible for various purposes.  Such purposes included establishing an ongoing war between DDC and PDL, defendants' membership in DDC, and defendants' motive to commit the Vigil shooting in PDL territory.  (See *People v. Champion* (1995) 9 Cal.4th 879, 921, overruled on another ground in *People v. Combs* (2004) 34 Cal.4th 821, 860 ["proof that defendants were members of the same gang formed a significant evidentiary link in the chain of proof tying them to the crimes in this case"].)  The evidence also demonstrated Daniels' and Barnes' presence and knowledge of the scene of both shootings, and rebutted the suggestion by defense counsel that the Vigil shooting did not increase DDC's reputation.  The court did not abuse its discretion by weighing this evidence and finding that each example of graffiti was admissible for purposes other than proving each defendant's

56

propensity for crime. (*Chhoun*, *supra*, 11 Cal.5th at p. 31; *People v. McCurdy* (2014) 59 Cal.4th 1063, 1095, 1108.)

Photographs of graffiti observed in June 2016 were relevant to establish the motive for the shootings by providing context on the ongoing gang war between DDC and PDL. In addition to the photographic evidence, the jury could readily infer from the June 2016 video depicting Daniels and Barnes tagging a Community Arms complex wall that both defendants were active DDC members who participated with one another in disrespecting PDL. (See *People v. Killebrew* (2002) 103 Cal.App.4th 644, 656–657 (*Killebrew*) [listing cases that have considered gang-related gang graffiti], overruled on another ground in *People v. Vang* (2011) 52 Cal.4th 1038.)

As to the post-shootings graffiti found in the CVS bathroom stall in February 2017, that evidence was relevant as the graffiti claimed DDC responsibility for the murder of its rival gang members ("We up one," "187 All"), and used the same derogatory statement ("Fucc Slobs") one of the shooters had shouted during the Vigil shooting. The graffiti was also relevant to rebut defense counsel's line of questioning on cross-examination of Detective Thomas that the Vigil shooting did not enhance DDC's reputation for purposes of proving the gang enhancement (former § 186.22).[32]

---

[32] Daniels and his codefendants were tried and convicted under former section 186.22, which provided a sentence enhancement for any person convicted of a felony committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct. However, former section 186.22, subdivision (b) did not define the term "to benefit, promote, further, or assist," and cases applying former section 186.22 found that the enhancement of a gang's reputation and that of its members served to "benefit, promote, further, or assist" the gang. (See *People v. Albillar* (2010) 51 Cal.4th 47, 63.)

As we discuss below, the Legislature has amended section 186.22 to clarify the meaning of benefiting, promoting, furthering, or assisting criminal

The timing in which these pieces of graffiti were observed (six months before, and one month after the Vigil shooting) did not deprive the evidence of its probative value.  (See *People v. Gionis* (1995) 9 Cal.4th 1196, 1213–1214 [statements are not necessarily so "remote as to be lacking in probative value" if they are made "almost a year and a half" after the crimes].)  "[W]hether the statements reflected merely a transitory state of mind, as opposed to something more [enduring], was a question for the jury to decide."  (*Id.* at p. 1214.)

Detective Thomas' testimony defining the term "BK" as "Blood Killers," which "indicates that this gang that tagged this, [DDC], are killers of the Blood gangs," was relevant to educate the jury on the meaning of the graffiti and thus its significance to the ongoing war between DDC and PDL.  (See *People v. Valencia* (2021) 11 Cal.5th 818, 838; *People v. Lindberg* (2008) 45 Cal.4th 1, 46–47 ["Numerous decisions in federal and other state courts also have upheld the admission of expert testimony to explain the culture and beliefs of . . . gangs and to interpret tattoos, symbols, and graffiti associated with these groups when such evidence was relevant to the issues at trial"], citing *U.S. v. Sparks* (8th Cir. 1991) 949 F.2d 1023, 1025–1026 [expert testimony explaining the meaning of gang graffiti and hand sign depicted in photographs properly admitted].)

We reject Daniels' argument that the graffiti-related evidence "was not really about proving a rivalry or motive, but instead was about the propensity [of Daniels and his codefendants] to commit dangerous crimes, and to enter conspiracies, which is improper."  Daniels' argument too narrowly construes

_____

street gang to include conduct that provides a "common benefit to members of a gang where the common benefit is more than reputational."  (§ 186.22, subd. (g).)  One example of a common benefit includes retaliation or targeting a perceived or actual gang rival.  (*Ibid.*)

the purposes for which the evidence was both proffered and admitted. Even if the evidence could be improperly used as character evidence, as we have discussed, the evidence was nevertheless offered and admitted for other valid purposes.

If Daniels was concerned with the limited admissibility of this evidence, he was required to request a limiting instruction on the evidence. (Evid. Code, § 355 ["When evidence is admissible . . . for one purpose and is inadmissible . . . for another purpose, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly"].) He did not do so, and he offers no reason why this general rule does not apply here. (*People v. Maciel* (2013) 57 Cal.4th 482, 529.)

Notwithstanding Daniels' failure to request a limiting instruction, we note that the court, on its own motion, provided an instruction on the limited purpose of "evidence of gang activity" and expressly prohibited the jury from using this evidence to find "the defendant is a person of bad character or that he or she has a disposition to commit crime." (Former CALCRIM No. 1403 (2006 rev.).) Instead, the jury was directed to consider evidence of gang activity "for the limited purpose of deciding whether: [¶] The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related enhancements and special circumstance allegations charged; [¶] OR [¶] The defendant had a motive to commit the crimes charged." (*Ibid.*) Thus, this limiting instruction, which we presume the jury followed, obviates any suggestion the jury used this gang-related evidence for propensity purposes. (*Chhoun*, *supra*, 11 Cal.5th at p. 30.)

#### d. *Gang Tattoos and Hand Signs*

Daniels next argues that pictures of his gang tattoos, including one of a large "d" on his left shoulder, and a picture of him standing next to Robinson making gang signs, were "largely irrelevant" and were used to exaggerate his gang involvement. Daniels is mistaken.

Prior to admitting these pieces of evidence, the court found they were relevant to Daniels' gang membership and his motive for committing the crimes charged, and that the probative value of the evidence exceeded any potential for prejudice. The court did not abuse its discretion in so ruling.

In a gang-related shooting, "evidence of defendant's and [his codefendants'] membership in and level of commitment to [the gang], including their [gang] tattoos and pictures showing them with other . . . gang members, . . . and evidence showing the workings and activities of [the gang] and the close connections among its members [is] relevant to both motive and identity." (*Valdez, supra*, 55 Cal.4th at p. 131; accord, *People v. Ochoa* (2001) 26 Cal.4th 398, 438 (*Ochoa*) [approving admission of gang expert testimony to explain significance of defendant's gang-related tattoos], abrogated on another point as stated in *People v. Harris* (2008) 43 Cal.4th 1269, 1306; see also *People v. Loeun* (1997) 17 Cal.4th 1, 6 [making gang sign relevant in that it could "signify membership in a 'Crip' gang"].)

To establish Daniels' membership in DDC and thus his motive to commit the charged crimes, the prosecution introduced photographs of two tattoos and a photograph of him making a gang sign consistent with DDC. Daniels argues that because the meaning behind his tattoos and hand sign are subject to reasonable dispute,[33] they lack any relevance to gang

---

[33] Daniels contends that his tattoo of the letter "d" appearing on his left shoulder matched another tattoo on his right shoulder of the letter "i," which

membership and motive.  As the trial court correctly found, this argument goes to the weight of the evidence and not its admissibility.  (*Ochoa, supra,* 26 Cal.4th at p. 438.)  Daniels was "free to highlight any overgeneralizations on cross-examination, and [he] did so at length."  (*Chhoun, supra,* 11 Cal.5th at p. 32.)

e.      *Gang Expert Testimony*

Daniels also contends that the court erred by admitting testimony from the gang expert, Detective Thomas, regarding his discussion about gang "missions," "going on route," and the illegal possession and use of firearms. We find none of Daniels' arguments persuasive.

Daniels first argues that Detective Thomas' testimony on these subjects was used to tarnish Daniels' character through "prior conduct evidence" under Evidence Code section 1101, subdivision (a).  But "[s]ubdivision (a) of section 1101 prohibits admission of evidence of *a person's* character . . . to prove the conduct of that person on a specified occasion."  (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393, italics added.)  As Daniels himself concedes, the testimony of Detective Thomas on these concepts did not connect Daniels or

---

"reflected [his] initials" rather than gang affiliation.  This same argument was raised by his trial counsel at an Evidence Code section 402 hearing.  The court found the argument went to the weight of the evidence and not its admissibility.

Citing the trial exhibit that depicted him making a gang sign, Daniels asserts that the picture showed him extending two fingers "versus the three finger hand sign that Crips use."  During cross-examination, Daniels' trial counsel asked the gang expert, Detective Thomas, to review the photograph to see if Daniels extended two fingers.  In response, Detective Thomas stated: "It appears that the thumb is also extended, but it's blurry, so it's three. . . . You can see the thumb is blurred, so there is, obviously, movement.  And so the person is holding three fingers up, and the hand is just turned."

his codefendants to any particular crime or prior bad act. As such, the testimony was never offered or admitted as prior acts evidence. (Cf. *People v. Cottone* (2013) 57 Cal.4th 269, 286, fn. 10 [admission of evidence under Evidence Code section 1101 "may entail preliminary fact determinations . . . such as the fact that the conduct occurred and the defendant's connection to it"].)[34]

Detective Thomas' testimony was admissible expert testimony on matters beyond the common knowledge and experience of the jury. "California law authorizes qualified experts to offer opinion testimony if the subject matter is 'sufficiently beyond common experience' such that the expert's opinion 'would assist the trier of fact.' (Evid. Code, § 801, subd. (a).) In general, "'[t]he subject matter of the culture and habits of criminal street gangs . . . meets this criterion.'" (*People v. Vang* (2011) 52 Cal.4th 1038, 1044 (*Vang*).)" (*People v. Flores* (2020) 9 Cal.5th 371, 398.) The substance of Detective Thomas' testimony gave meaning to the facts shown by the evidence, namely the coordinated communications and movement before, during, and after the Vigil shooting. This type of conduct was consistent with Detective Thomas' testimony on planning, congregation, and the execution of a plan by gang members.

The type of coordinated attack discussed by Detective Thomas was amply supported by the evidence in this case. (See *Vang, supra,* 52 Cal.4th at p. 1046 [expert opinion evidence must be "rooted in the evidence of the case

---

[34] The absence of any connection between Daniels and any prior bad act makes Detective Thomas' testimony significantly distinct from the testimony at issue in *People v. Guerrero* (1976) 16 Cal.3d 719, on which Daniels primarily relies. (See *id.* at pp. 722, 727 [testimony of Irene Lopez, "who claimed that defendant had raped her six weeks before the alleged murder," could not be used "to show that defendant killed Miss Santana in the course of an attempted rape"].

being tried, not some other case"].) Within minutes of the Duarte shooting, Daniels drove from Duarte to Pasadena, where he stayed for several hours in and around the Kings Villages complex. During that time, he communicated with Barnes and Robinson—each in the same area of Duarte—and Lee, who at the time was located in La Verne. Then, around 11:00 p.m., all of the defendants appeared in the same area of Duarte near the scene of the Duarte shooting before moving westward toward Pasadena at or near the scene of the Vigil shooting.[35] Minutes after the shooting, Daniels and Barnes were located at the intersection of Lincoln Avenue and Howard Street at the same time Daniels' car and additional vehicles were captured on video surveillance. Daniels and his codefendants moved back to Duarte before each traveled into Fullerton.

Discussion of gang missions by Detective Thomas gave meaning to these actions to prove that each defendant coordinated the Vigil shooting, intended that it occur, and actively facilitated the shooting in furtherance of the DDC. (See *Killebrew, supra,* 103 Cal.App.4th at p. 658 [admitting testimony "that gangs would travel in large groups if expecting trouble, that in a confrontation more than one gang member may share a gun in some identified circumstances, and that oftentimes gang members traveling together may know if one of their group is armed"]; *People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 773; *People v. Sandoval* (2015) 62 Cal.4th 394, 414–415; *People v. Monterroso* (2004) 34 Cal.4th 743, 772; see also *People v. Davis* (2009) 46 Cal.4th 539, 605 [upholding expert's "general

---

[35] Police received the shots-heard call at 11:51 p.m. Cellular phones that used towers covering the shooting scene and surrounding areas in Pasadena included Daniels' phone (11:34-11:53 p.m.), Barnes' phone (11:43-11:51 p.m.), and Robinson's phone (11:34 p.m.).

description of paraphilia and the behavior typical of persons who have this disorder" as evidence that correlated defendant's own behavior].)

Also supported by the evidence was Detective Thomas' discussion of gang members illegally obtaining firearms. As we discuss in more detail below, several months after the Vigil shooting, Lee sent Robinson a text message depicting four firearms with the following message: "40/450, 9/350, 380/100, 38/250." Expert testimony on the illegal sale or trade of firearms assisted jury in understanding the meaning behind this particular text message. (See *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550 ["gang sociology and psychology is beyond common experience and thus a proper subject for expert testimony"].)

Finally, Daniels argues that the definition of "going on route" as testified by Detective Thomas amounted to improper speculation as to the defendants' intent. Though we agree that experts may not offer an opinion on the mental state of a specific individual (*Killebrew*, *supra*, 103 Cal.App.4th at p. 658), the definition provided by Detective Thomas—that "going on route" referred to traveling to a place "with specific intent to carry out an act"—rendered no such opinion on Daniels' own intent during any particular time. (See *Vang*, *supra*, 52 Cal.4th at p. 1049 ["The expert did *not* give an opinion on whether the defendants did commit an assault in that way, and thus did *not* give an opinion on how the jury should decide the case"]; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1371 [expert "focused on what gangs and gang members typically expect and not on [one of the defendant's] subjective expectation in this instance"].)

64

### f. *Codefendant Robinson's Facebook Comment*

Daniels contends the trial court improperly admitted a photograph and attached Facebook comment obtained from Robinson's Facebook account. The picture depicts Robinson with a woman named Norneccia Givan-Simpson, and the attached comment written by Robinson on January 18, 2017, stated: "We look like we bout to ride on sumbody [*sic*]." According to the gang expert, Detective Thomas, the term "ride" refers to "travel[ing] from one place to another with another gang member just to—it's used in context . . . to mean going somewhere with some other gang members for a certain purpose." The term "ride" relates to gang "missions," as "it would be common for a 'mission' to be used as a term for when you are going . . . to 'ride' . . . to do it with other gang members."

We agree with Daniels that the Facebook picture and attached comment, occurring more than one week after the Vigil shooting, constituted improper evidence of an uncharged subsequent act. (Evid. Code, § 1101, subd. (a).) Robinson's comment did not tend to establish motive or intent to commit the charged offenses, and it did not touch upon the activities of Robinson specifically, or DDC more generally, in relation to an opposing gang.

Nevertheless, we need not determine whether Daniels' trial counsel was ineffective for failing to object to admission of the Facebook photograph and attached comment, as we find admission of this evidence harmless. (See *People v. Banks* (2014) 59 Cal.4th 1113, 1170 ["Where no prejudice showing has been made, there is no need to inquire whether counsel's efforts were in fact ineffective"], disapproved on another ground *People v. Scott* (2015) 61 Cal.4th 363.) "When evidence is erroneously admitted, we do not reverse a conviction unless it is reasonably probable that a result more favorable to the

defendant would have occurred absent the error.  (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); see *People v. Covarrubias* [(2016)] 1 Cal.5th [838], 887–888 [*Watson* standard applies in evaluating prejudice from state law error in admitting evidence].)"  (*People v. Powell* (2018) 5 Cal.5th 921, 951; *People v. Benavides* (2005) 35 Cal.4th 69, 93.)

The comment was authored not by Daniels, but by Robinson.  Nothing in the comment or the context in which the comment was admitted at trial tended to implicate Daniels in any manner.  The prosecution admitted the photograph and attached comment during Detective Sanchez's testimony on Robinson's Facebook account.  Daniels does not suggest that the prosecution used this piece of evidence to establish Daniels' own culpability.

Moreover, the evidence of Daniels' own involvement in the Vigil shooting and his consciousness of guilt was overwhelming.  As discussed, it was Daniels who initiated communication with his codefendants after the Duarte shooting, and it was Daniels who scouted the neighborhood prior to congregating with his codefendants before the Vigil shooting.  Daniels' car matched the description of a vehicle recorded on surveillance near the Vigil shooting, and after learning as much, he transferred ownership to his car— post-dating the transfer to one day before the Vigil shooting—and had the car repainted to divert any attention away from the vehicle.  It was also Daniels who contacted investigating officers in an attempt to redirect the investigation under the guise of a fake name.  Based on the foregoing, we conclude the jury would have reached the same result even if Robinson's Facebook comment had been excluded at trial.

## g. *Firearm-Related Evidence*

Finally, Daniels contends the court erred by admitting Google searches Lee had made on January 30, 2017, several weeks after the Vigil shooting, for how to maintain and break down Glock firearms. He also challenges the court's admission of the April 3, 2017 text message with an accompanying photo of four firearms that Lee sent to Robinson. Daniels asserts these pieces of evidence were irrelevant propensity evidence. We disagree.

As we discussed in *Lee*, the January 2017 Google searches and April 2017 text message were relevant and probative as to Lee's connection to the crimes in this case. The evidence did not show Lee's propensity to shoot people, but rather demonstrated his access to and familiarity with the same caliber of firearms that had been used during the shootings—either a .40 caliber Smith & Wesson or .38 special during the Douglas shooting, and a .9 millimeter during the Vigil shooting. (See *People v. Homick* (2012) 55 Cal.4th 816, 876; *People v. Riser* (1956) 47 Cal.2d 566, 577, overruled on another ground in *People v. Morse* (1964) 60 Cal.2d 631 ["When the specific type of weapon used to commit a homicide is not known, it may be permissible to admit into evidence weapons found in the defendant's possession some time after the crime that could have been the weapons employed. There need be no conclusive demonstration that the weapon in defendant's possession was the murder weapon"].)

When viewed in connection with other gang memorabilia, the coded language in Lee's April 2017 text message was also relevant to establishing his motive to commit shootings against a rival gang. (Compare *People v. Venegas* (2020) 44 Cal.App.5th 32, 40 [evidence of disassembled assault rifle and several magazines at codefendant's house tended to show codefendant kept weapons and, along with evidence of gang paraphernalia, demonstrated

he was an armed member of the gang]; see also *Ochoa, supra,* 26 Cal.4th at p. 438 ["we [have] approved the admission of a coded list that arguably referred" to matters relevant at trial].)  The evidence was admitted for relevant purposes, and it was not inflammatory, confusing, or prejudicial.

In sum, we conclude that Daniels has failed to establish ineffective assistance of counsel for his trial counsel's failure to object to the gang-related and firearm-related evidence which, with one exception we found to be harmless, was properly admitted.

D.　*Failure to Object During Closing Argument Did Not Constitute Ineffective Assistance*

For the first time on appeal, Daniels contends the prosecutor committed misconduct during closing argument when discussing gang evidence that Daniels contends was improper propensity evidence.  The failure of Daniels to object below and request a curative instruction forfeits his argument on appeal.  (*People v. Fuiava* (2012) 53 Cal.4th 622, 670–680; *People v. Lopez* (2008) 42 Cal.4th 960, 966.)  To avoid this conclusion, Daniels asserts ineffective assistance of trial counsel.  We reject this argument.

I.　*Relevant Background*

As discussed above, the court instructed the jury with former CALCRIM No. 1403, a limiting instruction on use of evidence of gang activity, prior to closing argument.  Among the prosecution's initial and rebuttal closing argument that comprises over 90 pages of reporter's transcript, Daniels challenges four remarks made in the initial closing, and five additional remarks in rebuttal closing argument.

During the initial closing argument, the prosecution stated as follows:

68

1.     "Their devotion to the Crip gang is everywhere, in everything they do. And it's important for you to see that and understand it to know what happened in this case. [¶] You saw throughout the gang evidence that what they care about, who they were beefing with was Pasadena. And the way they show that is to cross Pasadena out. Crossing out 'Pasadena, PDL.' 'We up one.' 'Fuck slobs.'"

2.     "All of this evidence tells you exactly who that circle of five is, who is in that circle of five. . . . And what you know about this circle of five is what's most important to them. What's important to them is their reputation as Duroc members, their status, earning stripes. They need credit for what they do. . . . They need credit for their violent acts. [¶] They commit terrifically violent acts to get that status, to earn those stripes so that they have a better reputation in their gang. It's been proven to you in this case that each one of them is a cold-blooded killer. Each one of them, to them, [the victims of the Vigil shooting] were just numbers to them."

3.     "What we also know is that they were on a mission. You heard Detective Thomas tell you about missions and how gang members are relatively sophisticated in this sense. They, actually, plan out these missions. They have roles. . . . [¶] And in this case, they went from Duarte to Pasadena and then back to Duarte. And later some went to Fullerton. This was a mission. And during that mission, they all had roles. They all aided and abetted each other, and they are all equally guilty."[36]

4.     "If you determine that the murders were first degree, then you will determine whether or not the special circumstances are true. And for this shooting, January 6, 2017, shooting, there's three special circumstances

---

[36]     The prosecution made these remarks shortly after discussing the evidence regarding each defendant's movement in Duarte and Pasadena.

that are alleged: multiple murders, . . . drive-by shooting . . . an[d] active participation in a criminal street gang. Since you heard the gang testimony about what this was, this is a mission. This is a Duroc Crip mission where five Duroc Crip gang members went there to commit multiple murders."

In his own closing argument, Daniels argued there was no evidence placing him or his car at the scene of the Vigil shooting, and no evidence he was ever armed the night of the Vigil shooting. He also argued that "the gang expert [(Detective Thomas)], didn't know anything about [Daniels] and couldn't give us any information about him, and he didn't interview him." "It's not enough to say that [(Daniels)] was a gangster." In addition, counsel for Robinson argued to the jury that Detective Thomas could not identify "'tangible evidence'" in which DDC's status had been elevated. "At first he [(Detective Thomas)] said no, but then he [identified] . . . [a]n unknown scribbled piece of graffiti that was hidden in the private confines of a bathroom toilet at CVS."

Daniels identifies five additional remarks made in the prosecution's rebuttal closing argument as follows:

5. "Counsel for Mr. Daniels argues there's no evidence [he] was armed on the night of the shooting. True, no eyewitness on January 6, 2017, can see a firearm in Mr. Daniels' hand. But where is he right here, right in the heart of the Blood territory in 2016? He is armed, and La'Shaun Morgan, he is armed. Duroc Crips are not going to go into rival territory unless they are prepared."

6. "What was this whole thing about on . . . January 6th of 2017? . . . Earning your stripes. Getting your kill. And notice in those [June 2016 graffiti] videos you see everything you need to know about gang tactics. Everyone's playing a role. Everyone's a participant. Mr. Daniels

videotaping, memorializing the events, and Mr. Barnes completing the crime."

7.    "Celebratory acts: What were they doing after the graffiti, during the graffiti?  Laughing, snickering, celebrating this great coo [*sic*] of going into rival territory and desecrating people's homes.  [¶]  The photographs on Mr. Barnes' phone: the burning of the red bandana effigy, a celebration, their hatred for PDL; the post-graffiti celebration in the CVS restroom."

8.    "Mr. Lee likes to plan.  He likes meetings.  Meetings, the hallmark of a conspiracy, conferences.  [¶]  What else does Mr. Lee like to do? He likes to research.  Like, on February 9, 2017, searching for how to sand down the barrel of a gun.  Counsel misses the whole point regarding those Google searches.  It's not whether a Glock was used but whether Mr. Lee plans and the research he does."

9.    "April 3rd, 2017, Mr. Lee texts this photograph to Mr. Robinson. What's been left out of this photograph?  The content of the text: 40/450, 9/350, 38/100, 38/250. . . .  [¶]  April 3rd, 2017, Derion Lee was trying to hock these guns.  He sent this photograph.  What other possible, reasonable conclusion can we draw from this . . . text?  He is trying to get rid of these guns.  And it tells you that Mr. Lee has intricate knowledge of weapons. What did Detective Thomas say?  They acquire guns illegally, and they sell them on the black market.  Complete corroboration of Detective Thomas."

II.    *Governing Law*

"The standards governing review of misconduct claims are settled.  'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such "'unfairness as to make the

71

resulting conviction a denial of due process.'" (*Darden v. Wainwright* (1986) 477 U.S. 168, 181; see *People v. Cash* (2002) 28 Cal.4th 703, 733.)'" (*People v. Williams* (2013) 56 Cal.4th 630, 671.)

A prosecutor ""'is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.]'"" (*People v. Stanley* (2006) 39 Cal.4th 913, 951; see *People v. Pensinger* (1991) 52 Cal.3d 1210, 1251 [a prosecutor "may even use such epithets as are warranted by the evidence"].) ""'Whether the inferences the prosecutor draws are reasonable is for the jury to decide.'" [Citation.]" (*People v. Thornton* (2007) 41 Cal.4th 391, 454.) "On the other hand, urging use of evidence for a purpose other than the limited purpose for which it was admitted is improper argument." (*People v. Lang* (1989) 49 Cal.3d 991, 1022 (*Lang*).)

However, "even otherwise prejudicial prosecutorial argument, when made within proper limits in rebuttal to arguments on defense counsel, do not constitute misconduct." (*People v. McDaniel* (1976) 16 Cal.3d 156, 177; see *People v. Panah* (2005) 35 Cal.4th 395, 464.)

"When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions,' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]'" (*People v. Centeno* (2014) 60 Cal.4th 659, 667.)

III.   *Analysis*

To demonstrate an ineffective assistance claim, Daniels must show (1) his trial counsel's performance was objectively unreasonable; and (2) the deficient performance prejudiced Daniels. (*Strickland v. Washington, supra,* 466 U.S. at p. 687.) Because the record does not show any explanation for Daniels' trial counsel's failure to object, we must reject his claim of ineffective assistance unless there simply could be no satisfactory explanation for counsel's inaction. (*People v. Huggins* (2006) 38 Cal.4th 175, 206; *People v. Dennis* (1998) 17 Cal.4th 468, 521.)

Daniels has failed to carry his burden. Nearly all the prosecutor's gang-related arguments were fair comments on the gang evidence. By addressing gang devotion, reputation within a gang, earning stripes, and the ongoing "beef" between DDC and PDL, the prosecutor properly suggested to the jury that it could infer each defendant had a motive to commit the charged offenses. The prosecutor's use of the term "mission" in closing argument did not urge improper use of the gang expert's testimony, but instead correlated the evidence of Daniels and his codefendants' movement and communications to support the inference that Daniels and his codefendants coordinated the Vigil shooting, intended that it occur, and actively facilitated the shooting in furtherance of their gang. These are all valid uses of the evidence under the trial court's limiting instruction.

Use of Lee's Google searches to suggest that he likes to "research" was also a fair comment on the evidence. The argument urged the inference that Lee planned both the Douglas and Vigil shootings. Similarly, the prosecution properly correlated Lee's April 2017 text message about four guns with Detective Thomas' expert testimony on the illegal possession and sale of

73

firearms. The argument highlighted the legitimate inference that Lee had illegally disposed of some of the weapons used in the Vigil shooting.

Argument on the February 2017 graffiti appearing in the CVS bathroom stall was also fair comment on the evidence and responsive to Robinson's counsel's closing argument. The prosecutor did not clearly attribute the February 2017 graffiti to any one of the defendants, and instead argued that the graffiti took credit for DDC as being "up one" on PDL. Indeed, the graffiti corroborated the prosecution's argument that DDC had been "beefing with Pasadena" in 2016 and 2017, and it constituted "tangible evidence" tending to show DDC's elevated status.

Finally, the prosecutor suggested the jury could infer from the video evidence that Daniels had previously been armed when he came into PDL territory that he would be armed whenever he was in that zone. Even if we view the prosecutor's comment as improperly suggesting to the jury that Daniels' past gun possession demonstrated he was the sort of person who carries weapons, we do not believe that brief comment could have prejudiced Daniels, given the overall strength of the evidence of Daniels' participation in the conspiracy to commit a gang retaliation shooting. Because the prosecution's remarks were at worst harmless error, counsel's failure to object to them could not have affected the outcome of the proceedings. Stated otherwise, even assuming counsel's performance fell below the prevailing professional standards, there was no resulting prejudice.

E.    *Sentencing Issues*

Daniels was sentenced separately from Lee, Robinson, and Barnes. We summarize the relevant sentencing proceedings as to Daniels before addressing his contentions.

74

I.    *Relevant Proceedings*

The court continued Daniels' sentencing hearing to March 8, 2021, to allow a bar panel attorney to review the trial record and investigate the effectiveness of Daniels' trial counsel at trial counsel's own request. The bar panel attorney investigated the matter and filed a report that identified several areas—all unrelated to the issues in this appeal—where trial counsel could have improved representation.[37]  Having identified these areas of improvement, the bar panel attorney "considered whether [trial] counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome.  **The answer is no**."

Upon its review of the bar panel attorney's report, the court adopted the report's findings by reference and found trial counsel's representation of Daniels to be both effective and non-prejudicial. The court also found that Daniels received a fair trial, and that "overwhelming" evidence was presented to establish his guilt on every count on which he was convicted.

Proceeding to sentencing, the court stated it had considered both the prosecution's sentencing memorandum and a pre-conviction probation officer's report prepared October 10, 2017, which the parties stipulated for use at sentencing. In the report, the probation officer stated that "[o]n August 25, 2017, police officers responded to Mississippi and arrested

---

[37]    Those areas included: (1) seeking appointment of a psychiatrist or psychologist to evaluate Daniels; (2) giving an opening statement; (3) taking "a more active and aggressive role and initiat[ing] a more expanded cross-examination" of witnesses; and (4) filing a motion to sever Lee's trial on the Douglas shooting.

[Daniels] for the current charges." The report estimated that Daniels had spent 49 days in "custody—county jail" as of the hearing date listed on the report (Oct. 12, 2017).

On both counts 2 and 3 (first degree murder of Sutphen and Duncan), the court sentenced Daniels to three terms of life without the possibility of parole based on the jury's special circumstance findings (§ 190.2, subds. (a)(3) [multiple murder], (a)(21) [drive-by murder], (a)(22) [gang murder]), plus a consecutive term of 25 years to life for the firearm enhancement (§ 12022.53, subds. (d)/(e)(1)).[38] On counts 4 and 9 (attempted premeditated murders of Janell and Wright), the court sentenced Daniels to a consecutive term of life imprisonment plus a consecutive term of 25 years to life for the firearm enhancement. On count 5 (shooting at an inhabited dwelling), the court sentenced Daniels to a consecutive middle term of five years (the court stayed a term of 25 years to life for the firearm enhancement). On count 1 (conspiracy to commit murder), the court imposed and stayed a term of 25 years to life for the underlying offense, plus 10 years, 20 years, and 25 years to life for the firearm enhancements (§ 12022.53, subds. (b)-(d)/(e)(1)).

The court stated that it was imposing consecutive sentences on all counts, as in each count the victims were particularly vulnerable, the manner of committing the crimes indicated planning and sophistication, and Daniels had engaged in violent behavior indicating a serious danger to society. (See Rules 4.425(b), 4.421(a)(3), 4.421(a)(8), 4.421(b)(1).) The court also indicated that Daniels had a prior criminal record, albeit a "minimal" one, and the instant crimes were increasing in violence and seriousness. (See Rules

---

[38] On counts 2, 3, 4, and 9, the court imposed and stayed terms of 20 and 10 years imprisonment for the lesser firearm enhancements (§ 12022.53, subds. (b)-(c)/(e)(1)) that the jury found to be true.

4.421(a)(1), 4.421(b)(2), 4.423(b)(1).) Following imposition of sentence, the court inquired about Daniels' custody credits. Daniels' trial counsel tentatively calculated 1,298 days of credit. The court stated that it would "go over that and see if we can confirm that. For now— [¶] . . . [¶] —we will say tentatively the credits are 1298 days." The court finished the sentencing hearing without confirming the calculation of custody credit. The sentencing minute orders and the abstract of judgment reflect custody credit of 1,292 days.

II. *Assembly Bill No. 333*

In his opening and supplemental briefs, Daniels contends that newly enacted Assembly Bill No. 333 (2021-2022 Reg. Sess.) (A.B. 333) requires (1) reversal and retrial of every count of conviction, and (2) reversal of all attached gang and firearm enhancements and gang special circumstance findings. (See Stats. 2021, ch. 699, §§ 1-5.) We agree with the latter contention but disagree with the former.

A.B. 333 expressed concern that former section 186.22 sometimes applied to "social networks of residents in neighborhoods" who were "often mischaracterized as gangs despite their lack of basic organizational requirements." (Stats. 2021, ch. 699, § 2, subd. (d)(8).) To address this concern, A.B. 333 amended section 186.22 to require proof of additional elements to establish a gang enhancement.

A.B. 333 also added section 1109 to the Penal Code, which provides that "[i]f requested by the defense, a case in which a gang enhancement is charged under subdivision (b) or (d) of Section 186.22 shall be tried in separate phases." (§ 1109, subd. (a).)

a. *Sections 186.22 and 12022.53*

Daniels contends, and the Attorney General agrees, that the amendments to section 186.22 should be applied retroactively to the gang enhancement. (§ 186.22.) Daniels also contends these amendments impact the gang-related firearm enhancements (§§ 186.22, 12022.53, subds. (b)-(d)/(e)(1)), and that under the new law, there is insufficient evidence to support imposition of those enhancements. He asks that we strike the true findings on these allegations and remand the matter to afford the prosecution the opportunity to retry the allegations.

The amendments to section 186.22 apply retroactively in this case. Section 186.22 provides for an enhanced punishment when the defendant is convicted of an enumerated felony committed "for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members." (§ 186.22, subd. (b)(1).) A.B. 333's amendments to section 186.22 apply retroactively to cases like the one here, in which the judgments of conviction have not become final prior to the effective date of A.B. 333. (*People v. Tran* (2022) 13 Cal.5th 1169, 1207 (*Tran*); *People v. Lopez* (2021) 73 Cal.App.5th 327, 343–344 (*Lopez*); *People v. E.H.* (2022) 75 Cal.App.5th 467, 478 (*E.H.*).)

We also agree with Daniels that the amendments require the reversal of the gang enhancements under section 186.22; the gang-related firearm enhancements under section 12022.53, subdivisions (d)/(e)(1), (c)/(e)(1), and (b)/(e)(1); and, despite the Attorney General's argument raised by supplemental brief,[39] the gang-murder special circumstance findings under

---

[39] Without any discussion or citation to authority, the Attorney General contends that Daniels "is not entitled to reversal of his firearm enhancements."

section 190.2, subdivision (a)(22). Prior to the amendments made by A.B. 333, a "criminal street gang" was defined as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more [enumerated criminal acts], having a common name or common identifying sign or symbol, and whose members *individually or collectively* engage in, or have engaged in, a pattern of criminal gang activity." (Former § 186.22, subd. (f), italics added.) A "'pattern of criminal gang activity'" was defined as "the commission of . . . two or more of the [enumerated] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." (Former § 186.22, subd. (e).)

Consistent with former section 186.22, the court instructed the jury in this case on the gang enhancement, and informed the jury that "[t]he crimes, if any, that establish a pattern of criminal gang activity, need not be gang-related." (See CALCRIM No. 1401.)

While this appeal was pending, A.B. 333 modified the definition of a "criminal street gang" to "an *ongoing, organized association or group* of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more [enumerated criminal acts], having a common name or common identifying sign or symbol, and whose members *collectively* engage in, or have engaged in, a pattern of criminal gang activity." (Current § 186.22, subd. (f), italics added.) A.B. 333 also redefined "'pattern of criminal gang activity'" to mean "the commission of . . . two or more [enumerated criminal acts], provided at least one of these offenses occurred after the effective date of this chapter, and the last of those offenses

occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed, the offenses were committed on separate occasions or by two or more members, *the offenses commonly benefited a criminal street gang, and the common benefit of the offense is more than reputational.*" (Current § 186.22, subd. (e)(1), italics added.) The statute also sets forth examples "of a common benefit that are more than reputational," which include "financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).)

"Thus, pursuant to the new legislation, imposition of a gang enhancement [now] requires proof of the following additional requirements with respect to predicate offenses: (1) the offenses must have 'commonly benefited a criminal street gang' where the 'common benefit . . . is more than reputational'; (2) the last predicate offense must have occurred within three years of the date of the currently charged offense; (3) the predicate offenses must be committed on separate occasions or by two or more gang members, as opposed to persons; and (4) the charged offense cannot be used as a predicate offense." (*Lopez*, *supra*, 73 Cal.App.5th at p. 345, quoting § 186.22, subds. (e)(1)-(2).)

We must vacate the jury's true findings on the gang enhancement (§ 186.22, subd. (b)(1)(C)), gang-related firearm enhancements (§ 12022.53, subds. (d)/(e)(1), (c)/(e)(1), (b)/(e)(1)), and gang-murder special circumstance (§ 190.2, subd. (a)(22)), as the absence of the new elements under the gang statute is not harmless under *Chapman v. California* (1967) 386 U.S. 18, 24. Under *Chapman,* "the absence of instruction on the amended version of section 186.22 requires reversal unless 'it appears beyond a reasonable doubt

80

that the error did not contribute to th[e] jury's verdict.' (*People v. Flood* (1998) 18 Cal.4th 470, 504.)" (*E.H., supra*, 75 Cal.App.5th at p. 479; *People v. Sek* (2022) 74 Cal.App.5th 657, 668–670 (*Sek*); see *People v. Merritt* (2017) 2 Cal.5th 819, 826–831.)

Here, to prove DDC was a criminal street gang under former section 186.22, the prosecution submitted evidence that two known DDC gang members (La'Shaun Morgan and Shawn Lyndolph) were each convicted of felon in possession of a firearm (§ 29800, subd. (a)(1)) in 2013 and 2016. The prosecution did not introduce evidence that those predicate offenses commonly benefited DDC, or that the common benefit of either crime was more than reputational. Nor was the jury instructed to determine this additional element under section 186.22; it was instead instructed that it need not find either predicate offense gang-related. Thus, on this record, we cannot conclude beyond a reasonable doubt that the omission of the new elements in section 186.22 did not contribute to the jury's verdict. The true findings under section 186.22 must be vacated, and the matter remanded to give the People the opportunity to prove the applicability of the enhancements under the amended law.

We also conclude that the changes wrought by A.B. 333 also require that we vacate the firearm enhancement and gang-murder special circumstance findings in this case (§§ 12022.53, subds. (b)-(d)/(e)(1), 190.2, subd. (a)(22)). Every true finding on the firearm enhancement allegations that the jury made was based on subdivision (e)(1) of section 12022.53, which provides that the court may impose additional sentences listed in subdivisions (b) through (d) if two conditions are found to be true: (1) the defendant was a principal in the underlying crime and violated section 186.22, subdivision (b); and (2) any principal in the offense committed any act

listed in subdivisions (b) through (d) in section 12022.53.  Section 190.2, subdivision (a)(22) requires proof beyond a reasonable doubt that the defendant "intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang."

The express reliance by both the firearm enhancement statutes and gang-murder special circumstance statutes on the definition of a criminal street gang in section 186.22 means that Daniels is entitled to the benefit of this change in the law as to every special circumstance and sentence enhancement finding under sections 12022.53, subdivisions (b)/(e)(1), (c)/(e)(1),  and (d)/(e)(1),  and 190.2, subdivision (a)(22).  (See *Lopez, supra*, 73 Cal.App.5th at p. 347.)

b.      *Section 190.2, subdivision (a)(22)*

As argued in *Lee*, here the Attorney General contends that while A.B. 333's amendments apply retroactively to the gang enhancement findings (§ 186.22), those amendments do not apply to the gang-murder special circumstance findings (§ 190.2, subd. (a)(22)).

The Attorney General's contention runs as follows.  The gang-murder special circumstance, section 190.2, subdivision (a)(22), was enacted by the voters as section 11 of Proposition 21 on the March 7, 2000 ballot.  (See *Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 897.)  Under the California Constitution, an initiative statute can be amended "only when approved by the electors unless the initiative statute permits amendment or repeal without [the electors'] approval."  (Cal. Const., art. II, § 10, subd. (c); accord, *People v. Superior Court* (*Pearson*) (2010) 48 Cal.4th 564, 568 (*Pearson*);

82

*People v. Kelly* (2010) 47 Cal.4th 1008, 1025.)  Proposition 21 does not permit amendment without the electors' approval or legislative amendment passed by two-thirds vote in each house.  (Ballot Pamp., Primary Elec. (Mar. 7, 2000) text of Prop. 21, § 39, p. 131 ["[t]he provisions of this measure shall not be amended by the Legislature except by a statute passed in each house by . . . two-thirds of the membership of each house concurring, or by a statute that becomes effective only when approved by the voters"].)  A.B. 333 was enacted without voter approval, and without the requisite two-thirds votes in both houses of the Legislature.  (See Sen. Daily J. (2021-2022 Reg. Sess.) p. 2284; Assem. Daily J. (2021-2022 Reg. Sess.) p. 2927.)  Accordingly, the Attorney General asserts that the Legislature lacked the power to unilaterally repeal or amend provisions of the initiative through A.B. 333.

According to the Attorney General, insofar as A.B. 333 seeks to redefine the definition of a "criminal street gang" in the voter-enacted gang-murder special circumstance, it runs afoul of the constitutional prohibition on legislative amendment of a statute adopted by initiative.  The Attorney General relies on a general principle of statutory construction: "'where a statute adopts by specific reference the provisions of another statute . . . such provisions are incorporated in the form in which they exist at the time of the reference and not as subsequently modified.'"  (*Palermo v. Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 58–59; see *In re Oluwa* (1989) 207 Cal.App.3d 439, 445.)  As enacted by section 11 of Proposition 21, the gang-murder special circumstance (§ 190.2, subd. (a)(22)) applies to any intentional killing committed by the defendant, if at the time he or she "was an active participant in *a criminal street gang, as defined in subdivision (f) of Section 186.22*, and the murder was carried out to further the activities of the criminal street gang."  (Ballot Pamp., *supra*, text of Prop. 21, § 11, p. 122,

italics added.)  The Attorney General contends that the italicized reference to section 186.22, subdivision (f) reflects an intent to incorporate that provision in the form in which it existed at the time Proposition 21 was adopted, and not as the provision might subsequently be modified.  Thus, according to the Attorney General, A.B. 333's amendments to section 186.22, subdivision (f), which changed the definition of a criminal street gang, cannot constitutionally be applied to amend section 11 of Proposition 21.[40]

However, as we discussed in *Lee*, the rule of statutory construction on which the Attorney General relies is not to be mechanically applied.  (*In re Jovan B.* (1993) 6 Cal.4th 801, 816, fn. 10 (*Jovan B.*); *People v. Pecci* (1999) 72 Cal.App.4th 1500, 1505.)  Rather, "where the words of an incorporating statute do not make clear whether it contemplates only a time-specific incorporation, 'the determining factor will be . . . legislative intent . . . .'" (*Jovan B.*, *supra*, at p. 816, quoting *People v. Domagalski* (1989) 214 Cal.App.3d 1380, 1386.)  Based on our review of the legislative materials previously discussed at length in *Lee, supra*, 81 Cal.App.5th at pages 241 through 245, we do not believe the voters contemplated a time-specific incorporation of the then-current version of section 186.22, subdivision

---

[40]    We restate the Attorney General's specific position here: "Admittedly, A.B. 333 did not directly alter the language contained in section 190.2, subdivision (a)(22).  However, A.B. 333 amended both subdivision (e) and (f) of section 186.22.  Because section 190.2, subdivision (a)(22), *specifically incorporates by reference*, and contains as an element, section 186.22, subdivision (f), which also necessarily includes as an element section 186.22, subdivision (e), A.B. 333's amendment of section 186.22, subdivisions (e) and (f), amended section 190.2, subdivision (a)(22)." (Italics added.)

(f), into the gang-murder special circumstance statute in Proposition 21. Thus, as set forth in *Lee*, we conclude the term "criminal street gang" as incorporated in the gang-murder special circumstance statute was "intended to conform at all times" and "remain permanently parallel" to section 186.22.[41] (*Jovan B.*, *supra*, 6 Cal.4th at pp. 816–817 & fn. 10.) We vacate the gang enhancement allegation findings (§ 186.22, subd. (b)(1)(C)), gang-related firearm use enhancements findings (§ 12022.53, subds. (b)-(d)/(e)(1)), and gang-murder special circumstance findings (§ 190.2, subd. (a)(22)). We also strike the sentences imposed under these findings and remand the matter to afford the People the opportunity to retry these allegations under the current law.[42]

### c.     *Section 1109*

As enacted by A.B. 333, section 1109 provides in relevant part that "[i]f requested by the defense," the trial court shall bifurcate a gang enhancement charged under subdivision (b) of section 186.22 from the underlying charges. (§ 1109, subd. (a).) The court shall then try the matter "in separate phases" by first adjudicating the question of the defendant's guilt of the underlying offenses; and if the defendant is found guilty of any offense, the court shall

---

[41]     Several decisions have adopted *Lee's* analysis on this issue. (See *People v. Oliva* (2023) 89 Cal.App.5th 76, 90 (*Oliva*), review granted May 17, 2023, S279485; *People v. Boukes* (2022) 83 Cal.App.5th 937, 943, fn. 5, review granted Dec. 14, 2022, S277103; *People v. Lopez* (2022) 82 Cal.App.5th 1, 24–25.) The Supreme Court has granted review in *People v. Rojas* (2022) 80 Cal.App.5th 542, which came to a contrary conclusion. (See S275835.)

[42]     In light of our conclusion, we do not consider the argument raised in Daniels' supplement brief concerning *Sek, supra*, 74 Cal.App.5th 657.

then hold "further proceedings to the trier of fact on the question of the truth of the [gang] enhancement." (§ 1109, subds. (a)(1)-(2).)

Daniels contend that section 1109 applies retroactively to this case under *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), and is a separate ground for reversing the gang findings and his convictions. We agree with the Attorney General that section 1109 does not apply retroactively to this appeal.

Our Supreme Court has explained that *Estrada* "established an exception to the general rule that no part of the Penal Code is retroactive. (§ 3 [no part of the Pen. Code is retroactive 'unless expressly so declared']; [citation].) In *Estrada,* we held that 'where [an] amendatory statute mitigates punishment and there is no saving clause, the rule is that the amendment will operate retroactively so that the lighter punishment is imposed.' [Citation.] [¶] . . . *Estrada* represents 'an important, contextually specific qualification to the ordinary presumption that statutes operate prospectively: When the Legislature has amended a statute to reduce the punishment for a particular criminal offense, we will assume, absent evidence to the contrary, that the Legislature intended the amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date.' [Citation.]" (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1195–1196 (*Hajek*), overruled on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192.)

In other words, the *Estrada* presumption applies whenever an amended statute mitigates or eliminates punishment for a criminal offense or enhancement. (*People v. Buycks* (2018) 5 Cal.5th 857, 882; *Estrada*, *supra*, 63 Cal.2d at pp. 743–744; *Hajek*, *supra*, 58 Cal.4th at p. 1196; see also *People v. Wright* (2006) 40 Cal.4th 81, 95–96 [*Estrada* applied to statute creating a

new affirmative defense]; *People v. Babylon* (1985) 39 Cal.3d 719, 721–722, 728 [statute narrowing class of prohibited acts]; *In re David C.* (2020) 53 Cal.App.5th 514, 519 [bill that "ameliorated the possible punishment for a class of persons"].)

Here, section 1109 does not reduce or eliminate punishment for an offense or enhancement, provide a new affirmative defense to a charged crime, or otherwise ameliorate the punishment for a class of individuals. The statute modifies trial procedures for defendants who have been charged with a gang enhancement and choose to invoke section 1109. When used in an appropriate case, section 1109 will only require adjudication on the question of a defendant's guilt of an underlying offense before further adjudicating "the question of the truth of the [gang] enhancement." (§ 1109, subd. (a)(2).) We also discern nothing in A.B. 333's legislative history that would represent an express declaration of retroactivity, or "'a clear and compelling implication'" that section 1109 should apply retroactively to cases that are not final. (*People v. Alford* (2007) 42 Cal.4th 749, 753.)

Acknowledging there is a split in authority on this issue, consistent with our prior decisions, we thus conclude that the *Estrada* presumption does not apply to section 1109; accordingly, section 1109 does not provide an independent ground for reversal of the gang-related findings or Daniels' convictions. (*People v. Boukes, supra,* 83 Cal.App.5th at p. 948; *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65, review granted Aug. 17, 2022, S275341; *People v. Perez* (2022) 78 Cal.App.5th 192, 207, review granted Aug. 17, 2022, S275090; *People v. Burgos* (2022) 77 Cal.App.5th 550, 569–575 (*Burgos*) (dis. opn. of Elia, J.), review granted July 13, 2022, S274743; accord, *People v. Cervantes* (2020) 55 Cal.App.5th 927, 940; *People v. Hayes* (1989) 49

Cal.3d 1260, 1274; but see *People v. Montano* (2022) 80 Cal.App.5th 82, 108 (*Montano*); *Burgos*, at pp. 568–569 (maj. opn. of Greenwood, P. J.).)

Recently, in *Tran, supra,* 13 Cal.5th 1169, our Supreme Court acknowledged the split of authority referenced above but declined to resolve the split (an issue currently under review in *Burgos*), concluding that any asserted error in the case before it was harmless under *Watson, supra*, 46 Cal.2d 818. (*Tran*, at p. 1208; see also *Oliva, supra,* 89 Cal.App.5th at p. 92, fn. 9 ["As [did] the court in *Tran*, we reject defendant's contention that review is subject to the beyond-a-reasonable-doubt standard of *Chapman*"].)

As in *Tran*, we conclude any failure to bifurcate the proceedings in this case was harmless under *Watson*. As we have discussed, almost all of the gang evidence was independently admissible on the defendants' state of mind. The membership of each defendant and their allegiance to DDC during an ongoing gang war was relevant and probative on their motive engage in a retaliation shooting, their intent to kill, the existence of premeditation and deliberation, and also to prove the gang-related special circumstance. (See *Oliva, supra,* 89 Cal.App.5th at p. 92 ["Section 1109 'does not apply to the determination of special circumstance allegations under section 190.2 (a)(22)'"], quoting *Montano, supra,* 80 Cal.App.5th at p. 114; *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1132 (*Ramos*) ["nothing in [A.B.] 333 limits the introduction of gang evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges"].)

And while the evidence of the predicate offenses committed by fellow DDC members (La'Shaun Morgan and Shawn Lyndolph) would have been excluded, evidence of these offenses—felon in possession of a firearm (§ 29800, subd. (a)(1))—was not particularly inflammatory given the offenses charged in this case. Nor did the prosecutor seek to admit additional

88

evidence of the offenses beyond the convictions themselves. Under the court's limiting instruction, we presume the jury did not conclude from this evidence that Daniels was a person of bad character or had a disposition to commit crime. (*People v. Waidla* (2000) 22 Cal.4th 690, 725.)

In short, because the gang evidence was cross-admissible to prove the gang-murder special circumstance and underlying charges, bifurcation of the gang enhancement allegations under section 1109 would not have materially affected the scope of evidence presented during trial on the remaining charges. (See *Oliva, supra*, 89 Cal.App.5th at pp. 91–93; *Ramos, supra*, 77 Cal.App.4th at p. 1132; *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049–1050.) Thus, even if section 1109 were retroactive, Daniels has failed to demonstrate a reasonable possibility that a bifurcated trial at the guilt phase would have affected the jury's verdict or true findings. (*Tran, supra*, 13 Cal.5th at p. 1210.)

III.    *Multiple LWOP Sentences Imposed on Counts 2 and 3*

Daniels contends, and the Attorney General concedes, that the sentencing minute orders must be corrected to reflect the imposition of one term of life imprisonment without the possibility for parole plus 25 years to life on each of counts 2 and 3. We agree.

The trial court erred by imposing three consecutive terms of life imprisonment without the possibility of parole on both counts 2 and 3 based on the three special circumstance findings attached to each murder count. (See § 190.2, subd. (a) [penalty for first degree murder is death or life imprisonment without the possibility of parole "if *one or more* of the following special circumstances has been found . . . to be true"], italics added; *People v.*

*Montes* (2014) 58 Cal.4th 809, 874 [a defendant "face[s] no additional punishment merely as a result" of multiple special circumstance findings].)

The abstracts of judgment for Daniels correctly reflect one term of life imprisonment without the possibility of parole plus 25 years to life for the firearm enhancement on counts 2 and 3. We direct the trial court to correct the minute orders as to all three appellants to properly reflect these sentences on counts 2, 3, and 6.


IV.    *Multiple-Murder Special Circumstance Findings*

Daniels contends, and the Attorney General agrees, that the trial court erred by imposing a term of life imprisonment without the possibility of parole on both counts 2 and 3 based on the multiple murder special circumstance (§ 190.2, subd. (a)(3)). (See *People v. Bonin* (1988) 46 Cal.3d 659, 691, overruled on another ground by *People v. Hill* (1998) 17 Cal.4th 800 [only one multiple-murder special circumstance may be alleged; no matter how many murder charges are tried together, they constitute a single multiple-murder special circumstance].)

The Supreme Court's remedy for cases in which numerous multiple-murder special circumstance allegations were charged and found true has been to "stri[ke] the superfluous finding and conclude[] the defendant suffered no prejudice." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 422; see *People v. Zamudio* (2008) 43 Cal.4th 327, 363; *People v. Nunez and Satele* (2013) 57 Cal.4th 1, 49 [vacating one of two multiple-murder special circumstance finding for each defendant].)

Consistent with these decisions, we vacate the multiple-murder special circumstance finding for Daniels on count 3. The section 190.2, subdivision (a)(3) enhancement shall remain imposed on count 2.

V.     *Custody Credit*

Daniels contends that his custody credits must be recalculated.  We agree.

When a criminal defendant who "has been in custody" is convicted and sentenced, the defendant is entitled to have "all days of custody . . . credited upon his or her term of imprisonment."  (§ 2900.5, subd. (a).)  "[C]redit shall be given only where the custody to be credited is attributable to proceedings related to the same conduct for which the defendant has been convicted." (§ 2900.5, subd. (b).)  "It is the duty of the court imposing the sentence to determine the date or dates of any admission to, and release from, custody prior to sentencing and the total number of days to be credited pursuant to this section."  (§ 2900.5, subd. (d); see *People v. Sage* (1980) 26 Cal.3d 498, 508 ["section 2900.5 imposes on the sentencing court the obligation to determine the number of days of custody"].)

"At the time of sentencing, the court must cause to be recorded on the judgment . . . the total time in custody to be credited on the sentence . . . .  On referral of the defendant to the probation officer for an investigation and report . . . the court must direct the sheriff, probation officer, or other appropriate person to report to the court and notify the defendant or defense counsel and prosecuting attorney within a reasonable time before the date set for sentencing as to the number of days that defendant has been in custody and for which he or she may be entitled to credit.  Any challenges to the report must be heard at the time of sentencing."  (Rule 4.310; accord, Rule 4.472.)

"It is the trial court, and not the appellate court, which has the capability of determining the facts from which the credit may be computed. If the court does not have enough facts at the time of sentencing, its duty is to

direct 'the sheriff, probation officer or other appropriate person' to produce the information.  At the time sentence is pronounced, the defendant and his attorney will be present and will have seen what is in the reports submitted to the court on this subject." (*People v. Montalvo* (1982) 128 Cal.App.3d 57, 62 (*Montalvo*).)  The defendant is generally entitled to notice and a fair hearing at the time of sentencing to determine the amount of custody credit to which he is entitled.  (*Ibid.*; *People v. Lara* (2012) 54 Cal.4th 896, 901, 906.)

Here, both parties agree that Daniels was sentenced on March 8, 2021. They disagree, however, on the date of Daniels' arrest for purposes of calculating presentence custody credit.  Citing to various portions of Detective Gomez's trial testimony, Daniels contends that his date of arrest "was, at the latest, June 8, 2017."[43]  The Attorney General cites to the probation officer's pre-conviction report, filed the same day of sentencing, as establishing August 25, 2017, as the date of Daniels' arrest.

We agree with the Attorney General that Detective Gomez's trial testimony does not constitute a "report to the court" by a probation officer or "other appropriate person" of the number of days Daniels had been in custody.  (Rule 4.310.)  We also agree that the probation officer's pre-conviction report meets this standard and establishes 1,292 days of custody credit to be awarded.

However, it is unclear from the sentencing hearing transcript whether Daniels or his defense counsel were notified "a reasonable time prior to the [hearing]" of the number of days identified in the probation officer's pre-conviction report, or of the court's intention to use the date of arrest provided

---

[43]    Officer Gomez testified that he was present in Mississippi when the United States Marshals arrested Daniels.  When asked what "timeframe [he] went to Mississippi," Officer Gomez stated that it "was June 6th, 7th and 8th, I believe."

92

in the report. On the contrary, the court indicated that it "tentatively" agreed with Daniels' own calculation of 1,298 days. Absent any indication the court would change its decision before terminating the sentencing hearing, we believe Daniels was deprived of a meaningful opportunity to challenge the trial court's factual determination that Daniels had been arrested on August 25, 2017. (See *Montalvo, supra,* 128 Cal.App.3d at p. 62.) To ensure he has the full opportunity to raise any challenges to the proper court, we remand the matter for the trial court to hold a hearing to determine the date Daniels was taken into custody for purposes of calculating his custody credit in accordance with Rules 4.310 and 4.472.

## DISPOSITION

On counts 1 through 5 and 9, we vacate the true findings on the gang-murder special circumstance allegations (§ 190.2, subd. (a)(22)), gang enhancement allegations (§ 186.22, subd. (b)), and gang-related firearm enhancement allegations (§ 12022.53, subds. (b)-(d)/(e)(1)), and strike the related sentences. On count 3, we vacate the true finding on the multiple-murder special circumstance allegation (§ 190.2, subd. (a)(3)).

The case is remanded to the superior court. On remand, the People shall decide whether to retry Daniels on the gang-murder special circumstance allegations (§ 190.2, subd. (a)(22)), gang enhancement allegations (§ 186.22, subd. (b)), and gang-related firearm enhancement allegations (§ 12022.53, subds. (b)-(d)/(e)(1)). If the People elect not to retry these allegations, the superior court is directed to resentence Daniels according to applicable law. If the People decide to retry Daniels on the gang-murder special circumstance allegations (§ 190.2, subd. (a)(22)), gang enhancement allegations (§ 186.22, subd. (b)), and gang-related firearm

enhancement allegations (§ 12022.53, subds. (b)-(d)/(e)(1)), and if any such allegations are found true, the court shall resentence Daniels according to applicable law.

Prior to holding any resentencing hearing in this matter, the trial court shall direct the sheriff, probation officer, or other appropriate person to report to the trial court, and to notify Daniels or defense counsel and the prosecuting attorney within a reasonable time prior to the hearing, as to the number of days that Daniels has been in custody and for which he may be entitled to credit, as set forth in Rules 4.310 and 4.472. If Daniels and/or the People choose to do so, both parties shall be permitted to present evidence to support any challenge to the date of Daniels' arrest and calculation of custody credits, and to be present at the hearing. The trial court shall make appropriate findings of fact and state on the record the reasons for its determination of Daniels' custody credit.

Upon determination as to the status of the gang-related allegations and special circumstances (no retrial, or retrial and final resolution), the clerk of the superior court shall prepare an amended abstract of judgment for Daniels reflecting the appropriate modifications, as set forth above, and forward it to the California Department of Corrections and Rehabilitation. In addition, the clerk shall correct the sentencing minute orders to reflect one term of life imprisonment without the possibility of parole on count 2 pursuant to section 190.2, subdivisions (a)(3) and (a)(21), and one term of life imprisonment without the possibility of parole on count 3 pursuant to section 190.2, subdivision (a)(21).

As modified, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


                                        STONE, J.*

We concur:


CURREY, Acting P. J.


COLLINS, J.

---

*Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.